OPINION OF THE COURT
Gabrielli, J.
The court is presented with a challenge to a complex and well-considered plan, the purpose of which is to provide support for the continuation of financially troubled cultural institutions and museums in the State of New York. The Legislature, by chapters 902 and 903 of the Laws of 1976, enacted articles 13-E and 13-F of the General Municipal Law known respectively as the New York State Cultural Resources Act (SCRA) and the New York City Cultural Resources Act *365 (CCRA). The immediate effect of these enactments was to permit the Museum of Modern Art to realize income through tax equivalency payments that would be made upon the completion and sale or rental of condominium apartments to be constructed above the museum facilities.
The history and background of the litigation which propelled this case to our court is simply stated. Special Term ruled the provisions of these statutes to be constitutional over plaintiff’s claims that the result of the enactments was not a general law but a special law, and as such exceeded constitutional limitations. The Appellate Division, with one Justice dissenting, reversed Special Term and has held that the SCRA was a special law that could only be applicable to the Museum of Modern Art, a private nonprofit educational institution. The majority also concluded that since the CCRA involved condemnation of property, diversion of tax revenues and, further, because it was enacted without a home rule message, the New York State Constitution had been violated in several respects.
For the reasons hereinafter assigned and stated, we reverse the order of the Appellate Division and reinstate the order of Special Term.
The SCRA provides for the creation of cultural trusts (public benefit corporations) which, when authorized by separate legislation, are given the power to assist participating cultural institutions in the construction of combined-use facilities, i.e., institutions where part is devoted to the cultural purpose, and part used for commercial purposes designed to produce financial support for the cultural part. The legislation further provides that a trust is granted a general tax exemption, including an exemption from real estate taxation on the combined-use facility developed by the trust (General Municipal Law, § 317). The owners of the commercial part of the combined-use facility are required, however, to pay to the trust amounts equal to the real property tax that would otherwise be payable to the municipality. By separate legislation, the trust must specify the purposes for which, such payments will be used (General Municipal Law, § 307, subd 3) in aid of the cultural institution. In addition, this combined-use facility may not be developed by the trust unless the cultural institution to be aided has held fee title to contiguous tax-exempt real property in excess of 50,000 square feet for a period of at least five years (General Municipal Law, § 307, *366 subd 1). The institution, if located within a city of one million or more population must have had average annual admissions of at least 500,000 persons for a period of at least five years, or average annual admissions of at least 50,000 persons for such a period if in a city with a population of 125,000 or more; and the attendance requirement may be satisfied on the basis of either the five-year period preceding enactment of the SCRA or the five-year period preceding the agreement between a trust and an institution for development of the combined-use facility (General Municipal Law, § 302, subd 5). It is further provided that the trust may acquire property by condemnation, but only if provided by separate legislation (General Municipal Law, § 307, subd 2).
The separate legislation needed to effectuate the general scheme of the SCRA on a local basis and to any particular cultural institution is, in the present instance, found in the CCRA. Under the CCRA a trust is created for New York City to develop combined-use facilities. The trust is empowered to acquire property by condemnation, but the area of taking is limited by metes and bounds to property contiguous to that owned by the Museum of Modern Art (General Municipal Law, § 329). The trust must remit to the city from tax equivalency payments an amount equal to the tax that otherwise would have been paid by the private owner of the condemned property, but not less than an amount equal to 10% of the tax equivalency payments for a period of 10 years following completion of the commercial construction; and the trust is to use the tax equivalency payments for servicing the debt incurred to build the institutional part of the combined-use facility. Then, after such servicing is complete, the tax equivalency funds are to be used only to pay the operating costs of the newly created institutional part of the facility. Any surplus of tax equivalency payments at the end of a fiscal year must be paid to the city (General Municipal Law, § 330, subd 1); and an abatement of tax equivalency payments is allowed while the facility is being constructed, and this abatement will follow a declining scale for the 10-year period following completion of construction (General Municipal Law, § 330, subd 2). Finally, the "effective date” portion of the CCRA legislation states: "This act shall take effect immediately, provided, however, that the provisions of the act shall not become operative unless and until the board of estimate, within ninety days after its enactment into law, adopts a resolution ratifying and *367 approving the provisions hereof’. The board’s approval was effected on September 16, 1976.
The Museum of Modern Art is the first cultural institution in the State to avail itself of the benefits of the legislation. The trust created under CCRA, in conjunction with the museum, developed a plan for building a combined-use facility adjacent to the museum building on West 53rd Street in Manhattan. Under the plan, its facilities would be expanded whereby a museum wing consisting of approximately 50 stories would be constructed on the west side of the museum’s existing building. The bottom six stories would be devoted to cultural purposes such as gallery space and a book store. The remaining stories would be used for condominium apartments from which the tax equivalency payments for support of the museum are to be derived. And the needed land would be acquired by the trust through its condemnation powers. Plaintiff is a qualified taxpayer, claims ownership to air rights which may be condemned, and owns land contiguous to the rights to be acquired.
Plaintiff has attacked the enabling legislation as being, in effect, special legislation designed only for the benefit of the Museum of Modern Art; and it is alleged that the precise specifications in the legislation, to wit, the ownership of 50,000 square feet of property for five years, along with the average annual admissions of at least 500,000 persons, applies only to this museum. This, it is urged, violates several provisions of New York State Constitution, among which are article IX (§ 2, subd [b], par [2] [necessity for a home rule message]); section 17 of article III (no private bill shall grant any private corporation any immunity or franchise); section 1 of article XVI (exemption from taxation to be granted only by general laws); and article I (§ 7, subd [a] [property cannot be condemned for private use]).
The Appellate Division majority adopted and accepted these arguments and reasoned that article IX (§ 3, subd [d], par [1]) of the Constitution defines a general law as one "which in terms and in effect applies alike to all counties * * * all cities, all towns or all villages”; and that, despite the drafters’ attempts to clothe the enactments with general language, they were tailored for the Museum of Modern Art, and only for that institution. If this view were accepted as valid, of course, it would necessarily follow that the enactments are in viola *368 tion of the Constitution in the several respects advanced by plaintiff and found by the Appellate Division.
The Special Term Justice, however, took a different view. He. stated.: "While the museum presently qualifies as the sole beneficiary of the statute, as has already been demonstrated the language of the law opens similar opportunities in the future to others who may be fitted into the wording of the statute. The new law does not grant any exclusive privilege or franchise and cannot under the circumstances be deemed a private bill since it satisfies the Constitutional test of generality. What is important, is that the grant according to the legislative findings, is for a public purpose both educational and cultural”.
It is significant to note that both courts below treated the case as one which turned on and was concerned only with questions of law, Special Term granting summary judgment for defendants, and the Appellate Division, on the other hand, denying that relief and granting summary judgment for plaintiff. Such being the case, it is difficult to understand why the Appellate Division majority stated in its opinion (63 AD2d, at p 162), "Nor is there any reasonable possibility that another cultural institution would ever become eligible.” Concededly, there is no agreed statement of fact in the record to support that conclusion — which is a conclusion that is essential to the Appellate Division’s holding.[1]
Although the statutory specifications fit the present statistics applicable to the Museum of Modern Art, there is no showing that other institutions could not, in time, meet them also.[2] Absent that showing, or absent a finding to that effect which could be made as a matter of law, a court is in no position to hold this legislation unconstitutional as special legislation applicable only to a single enterprise.[3]
*369 Seldom has any legislation been buttressed and accompanied by more detailed and elaborate legislative findings in support of its stated purposes. With respect to the SCRA, these findings consume two full pages of McKinney’s Laws (General Municipal Law, § 303) and are generally to the effect that cultural institutions and museums are to be preserved and fostered in the State public interest; that many of them are experiencing serious financial problems due to inflation with operating expenses outstripping revenues; that help must come from innovative plans for maximum use of real property which can support private enterprise which, in turn, can provide the needed revenue for the institutions; and that the plan will be of great aid to the cultural, educational and recreational interests of the residents of the State — and such is the plan of article 13-E. Similar, but briefer, findings accompany the CCRA in article 13-F (General Municipal Law, § 326).
In sum, the Legislature has thus clearly stated that these statutory plans comprise general legislation applicable Statewide to institutions which own or will own enough property, will serve the needs and desires of many people throughout the State, and generate enough existing interest to warrant recognition as institutions of sufficiently significant community value. Whether the Museum of Modern Art’s specifications were used simply as a model, or whether this particular museum was selected especially for initial help, or, indeed, whether there is a combination of both these factors, is of no consequence. The legislation is applicable to any institution which can meet the specifications, and plaintiff has not produced any proof that the Museum of Modern Art is the only institution which can ever do so.
Courts are required to exercise a large measure of restraint when considering highly intricate and imaginative schemes for public financing or for public expenditures designed to be in the public interest. Some may be highly *370 controversial. But when a court reviews such a decision, it must operate on the rule that it may not substitute its judgment for that of the body which made the decision. Judges, however much they might disagree with the wisdom of the act under review, are not free to invalidate it on that ground (Matter of Malpica-Orsini, 36 NY2d 568, 570, 571). It is appropriate to here quote from Wein v City of New York (36 NY2d 610, 619, 620): "Where, as here, the statutory scheme stays within the letter of the Constitution * * * then we should heed Judge Desmond’s statement in Comerski (308 NY 248, 254, supra) that 'We should not strain ourselves to find illegality in such programs. The problems of a modern city can never be solved unless arrangements like these * * * are upheld, unless they are patently illegal. Surely such devices, no longer novel, are not more suspect now than they were twenty years ago when, in Robertson v Zimmerman (268 NY 52, 62) we rejected a charge that this was a mere evasion of constitutional debt limitations, etc. Our answer was this (p 65): "Since the city cannot itself meet the requirements of the situation, the only alternative is for the State, in the exercise of its police power, to provide a method of constructing the improvements and of financing their cost.” ’ ”
There is a simple, but well-founded, presumption that an act of the Legislature is constitutional and this presumption can be upset only by proof persuasive beyond a reasonable doubt (Montgomery v Daniels, 38 NY2d 41; Matter of Malpica-Orsini, supra, at p 570). As noted above, there just is no such proof in this case and, indeed, there is no indication in the majority opinion below that this presumption of validity was given any effect or even recognized.
There is also, of course, a further presumption, long recognized by this court, that the Legislature has investigated and found facts necessary to support the legislation (I. L. F. Y. Co. v Temporary State Housing Rent Comm., 10 NY2d 263, app dsmd 369 US 795) as well as the existence of a situation showing or indicating its need or desirability (Matter of Van Berkel v Power, 16 NY2d 37, 40).
Any argument that the enactments under attack are invalid must fail. There is ample precedent to support this sort of financing effort, especially with respect to the device of having a public benefit corporation (in this case the trust) utilize the power of condemnation, and legitimize the tax *371 exemption for property, a portion of which is used for commercial purposes. In Bush Term. Co. v City of New York (282 NY 306), the Port Authority was authorized by statute to acquire property and construct a railroad terminal above which would be constructed space for commercial use. As this court stated: "Property held by an agency of the State is ordinarily immune from, taxation only while it is used for a public purpose. Property used primarily to obtain revenue or profit is not held for a public use and is not ordinarily immune from taxation, but property held by a State agency primarily for a public use does not lose immunity because the State agency incidentally derives income from the property” (282 NY, at p 321). The term "incidental” as thus used, does not mean that the public use must, as the court below indicated, outweigh the private use to which the facility is put. Certainly proportionate use was not a factor where the Port Authority was given the power to erect the World Trade Center where, by the terms of the statute, "portions of the buildings, structures, improvements and areas may * * * be devoted to * * * the production of incidental revenue * * * for the expenses of all or part of the port development project” (Courtesy Sandwich Shop v Port of N. Y. Auth., 12 NY2d 379, 390, app dsmd 375 US 78). Likewise, where the City of New York was deprived of tax revenues through a plan to allow for reconstruction of the Commodore Hotel, this court, in a unanimous decision, could find no unconstitutionality (Wein v Beame, 43 NY2d 326). There, all the property would be run for profit. Wembley would purchase the hotel from Penn Central for 10 million dollars and Wembley would then sell the building for one dollar to the Urban Development Corporation (UDC) thus rendering it tax exempt. The UDC would lease the building back to Wembley under a 99-year lease, the rent being payable to the city instead of the UDC, and for the first 40 years the rent would be less than the real estate taxes which otherwise would have been assessed. We held in that case that there was no violation of the New York State Constitution. We did note criticism of the plan through characterization of the UDC as a "strawman”, with no real interest in or connection with the project, which had been brought into the plan solely as a means of providing a tax exemption. But we held the scheme to be well within bounds considering that renovation of such a structure was a project to combat urban blight and thus in accord with the *372 purposes of the Legislature in creating the UDC (Wein v Beame, supra).
With respect to the question of condemnation, it is unquestioned that a public benefit corporation can condemn property for a public use, if authorized by statute (Matter of Keystone Assoc. v Moerdler, 19 NY2d 78). Of interest, such power was given to the Port Authority in Courtesy Sandwich Shop (supra) where, as already noted, the use to which the condemned property would be put would be partially revenue producing; and in that case this court wrote: "Nor can it be said that the use of property to produce revenue to help finance the operation of those activities that tend to achieve the purpose of the project does not itself perform such a function, provided, of course, that there are in fact such other activities to be supported by incidental revenue production” (12 NY2d, at p 389).
Surely, if the State Legislature and a responsible unit of local government (here the Board of Estimate) believe that the preservation of cultural institutions is in the public interest in that visitors will be produced in the city in which they are located, and benefit all who attend, city residents and visitors from throughout the State alike, legislation is legitimate which thus subsidizes the institutions. The method here used cannot be said to run afoul of the Constitution. The fact that the Board of Estimate approval was required does not render the CCRA a special law. The Legislature can, without creating a special or local law, provide that a general law will not become effective until approved at the local level (Bank of Chenango v Brown, 26 NY 467; Corning v Greene, 23 Barb 33), although such approval is not necessary.[4]
 The traditional and legal test for a local law is whether the statute affects the "property, affairs or government” of a governmental subdivision of the State (NY Const, art IX, § 2), but that terminology does not prohibit the State from legislating with respect to these concerns (Wambat Realty Corp. v State of New York, 41 NY2d 490, 494; Adler v Deegan, 251 NY 467, 491, mot for rearg den 252 NY 574). As was stated in Wambat: "Thus, in the decisively enlightening case of Adler v Deegan, the court rejected a home rule challenge to the then Multiple Dwelling Law even though the *373 statute treated only with housing in New York City” (41 NY2d, at p 494). If the subject matter of the legislation is of sufficient importance to the State generally, the legislation cannot be deemed a local law even though it deals directly with the affairs of a municipality (ibid.). This has been an accepted principle for many years, and there is ample showing from the legislative findings alone that the maintenance of cultural institutions is a State concern. Even if we considered that this legislation presently affects but one museum, the preservation of that one facility is of importance to the citizens of the State as well as the city. And, contrary to the unsupported finding below, the legislation is not confined to but this one facility. A class is opened up to similar treatment under the terms of the SCRA (see Farrington v Pinckney, 1 NY2d 74, 78, 79). Because of certain inequalities in the past where an exemption was unfairly granted to one applicant but denied to another similarly situated, the Constitution was amended to prohibit such action (see New York Constitutional Convention Committee [1938], Problems Relating to Taxation and Finance, pp 204-206). If, however, the legislative exemption is granted to a class, there is no constitutional impairment. "Early was it said that an act need not apply to all persons, places or things in the State to be deemed general, if it apply to a class, entry into which was governed by conformity or compliance with specified conditions” (Farrington v Pinckney, supra, at p 78). The case before us now certainly fits this yardstick and definition. Where, as here, the method of providing aid has an equal impact on all members of a rationally defined class similarly situated, the law is thus a general and not a special one (Wein v Beame, 43 NY2d 326, 331, supra).
In one of the rare instances in which a statute couched in "general” language was held to be special, Judge Cardozo wrote: "We close our eyes to realities if we do not see in this act the marks of legislation that is special and local in terms and in effect. This group of conditions so unusual and particular is precisely fitted to the claimants’ case, and only by a most singular coincidence could be fitted any other” (Matter of Mayor of City of N. Y. [Elm St.], 246 NY 72, 77-78). That case involved a statute which purported to revive entitlement to condemnation awards (generally) which had been barred by the Statute of Limitations. The "class” was limited to those who could show fact situations which, however, arose out of *374 one particular instance. Thus, in reality, the statute could benefit only that one claimant. There was no way that anyone else could qualify because the requirements for entitlement consisted of events which had already taken place. In the case before us, however, the situation is, as above pointed out, quite different.
In summary, since the bulk of the reasons for the finding of unconstitutionality below rest on the completely unsubstantiated theory that the SCRA and the CCRA combine to form special and local legislation, such claims are completely dissipated when the claim of special or local legislation is found to have no vitality in any degree.
Accordingly, the order of the Appellate Division should be reversed, with costs, and judgment granted to appellants declaring the challenged legislation constitutional.

. This conclusion by the court below is apparently based on the following statement found later in the opinion: "Respondents, in fact, concede that only [the Museum of Modern Art] fits all the statutory eligibility criteria for a participating cultural institution.” (63 AD2d, at p 165.) It is not denied that at the present time the museum is the only institution meeting the statutory specifications. Obviously, there is no concession, however, that no other institution could ever become eligible.

. The Whitney Museum of American Art has submitted an amicus brief in which it is noted that it, together with several other named museums, "may be able to benefit from the provisions of the challenged legislation by participating and expanding their own facilities”, a point which we take note of, without giving it any conclusive effect, which is indeed unnecessary upon our analysis.

. The fact that the class may be small does not make the law special (Matter of *369 McAneny v Board of Estimate & Apportionment of City of N. Y., 232 NY 377). There a statute establishing a transit commission in cities of over 1,000,000 was challenged as an invalid special law. Although the year was 1922 and Buffalo, the second largest city in the State, had less than that number of inhabitants, this court said: "It may be conceded that at the present time [the law] is applicable only to the city of New York, but if so it by no means follows that it was intended only for that city, since there may and probably will in the near future be one or more cities to which it will be applicable. Certainly there is no conclusive presumption to the contrary” (id., at p 393).

. It is to be noted that the Constitution does not prohibit the Legislature from acting without a home rule message on matters of State concern (Wambat Realty Corp. v State of New York, 41 NY2d 490; Adler v Deegan, 251 NY 467).