Honorable Edward V. Regan Comptroller Department of Audit and Control
You have asked my opinion whether it would be legal to issue scrip to pay State employees as was done in 1981. Your inquiry assumes that the Legislature will fail to adopt either a timely budget for 1982-83 or an interim appropriation bill to pay the State's employees.
The following statement of the scrip issuance procedure is based on facts furnished by your staff in response to inquiries we made after receiving your request for an opinion. They assure us that it is a correct summary of the procedure, if adopted:
 (1) The Commissioner of Taxation and Finance would continue to deposit revenues, as received by the State, into its general checking account (see, State Finance Law, §§ 101, 105);
 (2) The State would maintain in its general checking account the amount of money that would, if appropriated, be available to pay employees' net earnings, but no checks would be drawn on this account (i.e., until appropriation bills were enacted);
 (3) On pay day the State would issue scrip — i.e., non-negotiable "statements of net earnings" — to its employees;
 (4) On the back of each statement of net earnings would be a form ("assignment of wages") whereby the employee could assign his or her net earnings to the bank where the general checking account is maintained (the bank);
 (5) The bank would, if agreeable, pay the amount of the employee's net earnings to the employee in return for the execution of the assignment of wages;
 (6) The State's general checking account would not be debited by the bank;
 (7) At such time as personal services appropriations were adopted by the Legislature, the bank would surrender all assignments of wages in its possession to the State for payment from the general checking account;
 (8) Any employee who did not assign his or her wages to the bank, would surrender the statement of net earnings to the State for payment from the account.
On the foregoing facts, the existing legal authority leads to the conclusion that the issuance of scrip would probably be upheld by the courts. The question, however, is not free from doubt. There is no judicial precedent squarely on point. Because of the grave consequences to the State were such a procedure to be used and thereafter invalidated by the courts, I must counsel that its use would be inadvisable.
The reasons for my view that scrip probably could withstand legal attack are as follows:
First, it is fundamental that the State could not enter into a contract that would create an enforceable obligation of the State to repay the bank directly, that is, to guarantee that scrip would be honored. You advise that the State would not be entering into any contract with the bank which would accomplish this purpose. At most a moral debt would be created which the State would have the power, but not the duty, to pay.
The cases upholding moral obligation financing are especially relevant.
Thus, in Comereski v City of Elmira (308 N.Y. 248 [1955]) the City of Elmira had agreed to make annual payments to the Elmira Parking Authority, if necessary, to meet any deficit in the fund of the Authority established to pay debt service on its bonds. This commitment by the City provided significant backing for the Authority's bonds. Yet the Court of Appeals found that the payments made by the City were mere gifts of the City's money to another public corporation and that the City had not loaned its credit to the Authority. The Authority's bonds were neither obligations nor debt of the City.
More recently in Wein v City of New York (36 N.Y.2d 610 [1975]), the Court of Appeals on a similar rationale upheld as valid a statute providing for a creation of a Stabilization Reserve Corporation for the City of New York which had as its sole purpose the sale of obligations, the proceeds of such sale to be available to the City of New York. The statute provided that the capital reserve fund from which the Corporation's bonds would be paid would be replenished annually by the City of New York after certification of the necessary amount by the Chairman of the Corporation; if the City failed to appropriate sufficient funds for this purpose, the required reserve would be made up by payments due the City from the Stock Transfer Tax Fund or if insufficient, from per capita State aid apportioned to the City. The Court of Appeals stated:
 "Where, as here, the statutory scheme stays within the letter of the Constitution (and carefully so, I believe) then we should heed Judge DESMOND'S statement in Comereski (308 N.Y. 248, 254, supra) that `We should not strain ourselves to find illegality in such programs. * * *'" (Id., at 619.)
Proceeding with confidence on the basis of the decision in Wein v City ofNew York, the Legislature enacted the Municipal Assistance Corporation (MAC) Act. On the faith of a moral obligation, billions of dollars have been made available to the City of New York through MAC. The proceeds of the State sales tax of 4% in the City of New York are the primary source of payment for MAC bonds. They are set aside for MAC bondholders; they are not part of the general fund and may not be used for any other purpose. However, these tax revenues must first be appropriated by the Legislature. Neither MAC nor its bondholders has a lien on such revenues, nor can they compel the appropriation, nor can they successfully sue the State. MAC debt is neither State nor City debt in the constitutional sense.
Under moral obligation financing a score of New York statutes have provided that when a public corporation certifies to the Comptroller that there is a shortfall in its debt reserve fund, the State "shall" pay whatever is required to enable the corporation to make timely payment of principal or interest. There is no legal compulsion on the State to appropriate and pay, yet on the faith of the State's moral obligation, the Capital market has brought billions of dollars of these bonds. (See, e.g., Urban Development Corporation Act [L 1968, ch 174, § 1], § 20, subd [3] [McKinney's Unconsolidated Laws, § 6270, subd 3]; Public Authorities Law, §§ 1291, subd [3] [Environmental Facilities Corp.], 1860-a, subd [3] [Energy Research and Development Authority], 2408, subd [2] [State of New York Mortgage Agency], 3036, subd [4] [Municipal Assistance Corp. for the City of New York]; see also Matter of City ofNew York [UN Development Corp.], 72 Misc.2d 535 [Sup Ct, N Y Co, 1972].)
In other contexts as well, the Court of Appeals has given wide latitude to the Legislature's power to shape imaginative fiscal devices. Relying on the language from Wein v City of New York, quoted earlier, the Court in Hotel Dorset Co. v Trust for Cultural Resources (46 N.Y.2d 358 [1978]) upheld a scheme whereby the condominum structure built alongside the Museum of Modern Art is tax exempt. Compare Wein v Levitt (42 N.Y.2d 300
[1977]), where the Court declined to find a loan of the State's credit to public corporations or any other constitutional violation in a statutory plan whereby the State agreed to indemnify not only a public corporation and its officers but outside investment advisors as well for any judgment entered against them as a result of the investment in obligations of the "build out" authorities. See also, Wein v Beame (43 N.Y.2d 326 [1977]);NYPIRG v American Stock Exchange (Sup Ct, Albany Co, per HUGHES, J., July 1, 1980).
These cases support the conclusion that the issuance of scrip would not constitute an unlawful contracting of State debt in violation of Article VII, § 11 of the State Constitution, nor an unlawful loan of the State's credit either to the State employees or to the bank in violation of Article VII, § 8. The State would be under no legal obligation to the bank to honor scrip; a moral obligation to do so does not offend the Constitution.
Second, as there would be no pay-out, or expenditure, of money from the State Treasury to pay State employees their net earnings, the constitutional requirement of prior appropriation would not appear to apply. Article VII, § 7 of the State Constitution provides: "No money shall ever be paid out of the state treasury * * * except in pursuance of an appropriation by law * * *."
I believe that the recent decision of the Court of Appeals in Anderson vRegan (53 N.Y.2d 356 [1981]), strictly construing the appropriation requirement of Article VII, § 7, would not be applicable. In Andersonv Regan it was held that "state treasury" included federal funds received by the State to be disbursed pursuant to congressional appropriation. There was no doubt that the funds involved were expended by the State. The issue was whether federal funds were funds of the State Treasury (hence subject to the constitutional requirement of appropriation prior to expenditure).
In the case of scrip the issue would be quite different, namely, whether funds in the State Treasury would be expended (or "paid out") under the procedure described earlier, pages 1-2, for the issuance of scrip. In my opinion, since the State's general checking account, where most funds coming into the State Treasury are deposited throughout the fiscal year, would not be debited when the bank accepts assignments of wages from State employees, there would be no expenditure of State funds and, thus, no money would be "paid out" of the State Treasury. A decision by the State to retain money in its general checking account cannot in ordinary parlance be considered an expenditure of that money.
I note that Sections 105 and 106 of the State Finance Law require that specified collateral in an amount approved by the Commissioner of Taxation and Finance and/or you must be deposited with you as security by any bank where State funds are deposited. Because of this legislative requirement you must insure that adequate security is maintained for the amount of State money in the general checking account throughout any period when scrip is outstanding.
This opinion is responsive to the specific question raised in your letter, namely, the legality of the issuance of scrip, i.e., statements of net earnings, to State employees. A similar procedure could probably be used for the payment to third parties of employee benefits or other payroll deductions, provided that such benefits and deductions were paid from the bank's funds on behalf of State employees.
One final caution: If the adoption of a budget should legitimately be delayed by factors that are intractable, an interim appropriation measure could be introduced and adopted (see, N Y Const, Art VII, § 5) so long as money to meet the State payroll were actually in the Treasury, thus obviating the need for scrip. The availability of this alternative gives me concern that under such circumstances a court might look askance at the issuance of scrip for it could not then be said that this procedure would be, in the absence of a budget, the only way for the State to continue to meet its obligations.
In providing this legal analysis, I again caution you that the outcome of litigation challenging the issuance of scrip is not free from doubt. The outcome of a legal action can never be predicted with certainty, especially when as in the present case there is no judicial precedent squarely on point.
The Constitution contemplates the timely adoption of a budget, and the State's borrowing to meet needed local assistance payments and support to State institutions depends on it. It is hardly necessary for me to remind you that the State's credibility in the capital markets for fiscal rectitude is of the utmost importance. Thus, while opining that the issuance of scrip would probably withstand a constitutional attack, I strongly recommend that you do not assume the risk of an adverse judicial decision. I further emphasize in this regard that although you probably have the power to issue scrip, you are clearly under no legal obligation to do so should you regard that course as fiscally imprudent and not in the State's best interest.