Bellacosa, J.
(dissenting). Respectfully, we would declare chapter 390 of the Laws of 1997 constitutional. Thus, our vote is to reverse the order of the Appellate Division.
The constitutional cornerstone of this statute rests on three strong pillars: (1) the presumption of constitutionality afforded to every enactment of the Legislature; (2) the lack of any persisting or new constitutional faults under presently governing Establishment Clause jurisprudence; and (3) the explicit removal from chapter 390 of previously adjudicated constitutional defects.
I.
Initially, the “simple, but well-founded, presumption that an act of the Legislature is constitutional * * * can be upset only by proof persuasive beyond a reasonable doubt” (Hotel Dorset Co. v Trust for Cultural Resources, 46 NY2d 358, 370 [citations omitted]). Indeed, this Court frequently prefaces its statutory analyses with the acknowledgment that a legislative enactment derives from a “co-equal branch of government”, and any *698 challenger trying to undo a statute bears a heavy burden (City of New York v State of New York, 76 NY2d 479, 485; see also, Elmwood-Utica Houses v Buffalo Sewer Auth., 65 NY2d 489, 495).
As a corollary to these fundamental premises, a “further presumption, long recognized by this court, [is] that the Legislature has investigated and found facts necessary to support the legislation * * * as well as the existence of a situation showing or indicating its need or desirability” (Hotel Dorset Co. v Trust for Cultural Resources, supra, at 370 [citations omitted]). Balancing the myriad policy and empirical considerations that affect lawmaking is a function entrusted by the Constitution to the Legislature, the elected representatives of the people; courts are obliged, therefore, to be exceedingly wary of substituting their own balancing exercises (see, Matter of Wolpoff v Cuomo, 80 NY2d 70, 79). In particular, courts owe respectful attentiveness “to public funding programs essential to addressing the problems of modern life, unless such programs are ‘patently illegal’ ” (Schulz v State of New York, 84 NY2d 231, 241, citing Hotel Dorset Co. v Trust for Cultural Resources, supra).
Chapter 390 of the Laws of 1997 allows some public funding to qualifying municipalities through the instrumentality of a separate public school district. It is uncontroverted that the Legislature’s initial impetus for crafting an enactment was to redress a modern educational conundrum encountered by the Village of Kiryas Joel with respect to some of its neediest citizens, its handicapped children. It is also undisputed that when the two prior versions of statutory authorization were declared constitutionally faulty, the Legislature corrected the identified problems. Indeed, it is now three times that different Legislatures have passed, and two different Governors have approved, legislation to address the conceded concerns of these needy children within the environment of their civic community.
We dissenters examine the legislation as enveloped, not “insulated” as the Majority suggests, by its traditional array of presumed legitimacy (majority opn, at 689, n 6). From our well-established analytical perspective, the Legislature meets all constitutional prescriptions, including those previously delineated by this Court.
II.
In May 1997, this Court nullified chapter 241 of the Laws of 1994, the Legislature’s second attempt to allow the people of *699 the incorporated Village of Kiryas Joel to form a separate public school district. This Court found the definition of municipality as the principal flaw because it was limited, such that no existing municipality, aside from Kiryas Joel, met, or probably ever could meet, the statutory requirement.
This Court unanimously agreed that the statutory effect of singling out the Village of Kiryas Joel in this manner violated the second prong of the Lemon test, which mandates that government action cannot have a principal or primary “effect” of advancing or inhibiting religion (Lemon v Kurtzman, 403 US 602, 612). Also relying on an “endorsement” examination, this Court noted that even when a challenged statute appears neutral on its face, the Supreme Court has guarded against State action that is sufficiently likely to be perceived by adherents of a religion as an endorsement and by nonadherents as a disapproval of their religious or nonreligious choices (see, Grumet v Cuomo, 90 NY2d 57, 74 [Kiryas Joel II], citing School Dist. of City of Grand Rapids v Ball, 473 US 373, 390, overruled in part by Agostini v Felton, 521 US 203).
A month later, in June 1997, the Supreme Court of the United States decided Agostini v Felton (521 US 203, supra). It scrutinized the evolution of Establishment Clause jurisprudence since the 1985 decision of Aguilar v Felton (473 US 402) and overruled it. Ironically, Aguilar had triggered the initial difficulties between the Village of Kiryas Joel and the MonroeWoodbury School District. The Supreme Court, in Agostini, without expressly indicating so, compressed the Lemon test into two prongs — (1) whether the government acted with a secular purpose; and (2) whether the government aid has the “effect” of advancing or inhibiting religion, which includes an examination of whether the aid results in an excessive entanglement between church and State (see, Agostini v Felton, supra, at 222-223, 232-233; see also, Baxter, Managing Legal Change: The Transformation of Establishment Clause Law, 46 UCLA L Rev 343, 399-409 [1998]).
Indeed, the Agostini Court went into great detail about changes in the contours of this jurisprudence since its Aguilar and Ball decisions; specifically, changes emerged in the Supreme Court’s understanding of the criteria used to assess whether aid to religion has an impermissible effect (see, Agostini v Felton, supra, at 223). The Supreme Court stated that the “three primary criteria we currently use to evaluate whether government aid has the effect of advancing religion” are: whether the aid results in governmental indoctrination; *700 whether aid recipients are defined by reference to religion; and whether an excessive entanglement is created (id., at 234).
Applying these criteria, Agostini stated that “where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis”, there is a less likely effect, of advancing religion (id., at 231). The Supreme Court very significantly and specifically noted that Ball and Aguilar had not considered this important result of neutral criteria (id., at 231). Further, using the same delineated “effects” considerations to perform an “endorsement” analysis, the Supreme Court also did not find an endorsement of religion where funding was provided on a neutral basis (id., at 235; see also, Baxter, op. cit., 46 UCLA L Rev, at 409), Accordingly, Agostini overruled Aguilar and the pertinent parts of Ball (see, Agostini v Felton, supra, at 236). In particular, the Agostini Court noted that it was not “willing to conclude that the constitutionality of an aid program depends on the number of sectarian school students who happen to receive the otherwise neutral aid” (id., at 229).
It was at this key point in the maturity of the First Amendment (Establishment and Free Exercise of Religion) that the New York State Legislature, in August 1997, enacted chapter 390 of the Laws of 1997.
III.
Since the examination of the first statutory effort in 1989, various courts have indicated that a neutral statute would be constitutionally acceptable. The Supreme Court of the United States indicated that the 1989 statute, which referred to Kiryas Joel by name, was too narrow considering the religious nature of the Village and the “anomalously case-specific nature of the legislature’s exercise of state authority” (Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet, 512 US 687, 703 [Kiryas Joel I], affg Grumet v Board of Educ. of Kiryas Joel Vil. School Dist., 81 NY2d 518). Justice O’Connor, however, suggested that “[a] district created under a generally applicable scheme would be acceptable even though it coincides with a village that was consciously created by its voters as an enclave for their religious group” (id., at 717 [O’Connor, J., concurring]).
Then, this Court found that the 1994 version of the statute, which was considered facially neutral, still did not insure appropriate neutrality iti application. Due to the “nonneutral effect of allowing the religious community of Kiryas Joel, but no *701 other group at this time and probably ever, to create its own school district,” the statute was deemed unconstitutional (Grumet v Cuomo, 90 NY2d 57, 69, supra). On the other hand, the Court said that, “statutes of general applicability that extend their benefits without regard to religion honor the neutrality requirement and are generally beyond Establishment Clause reproach” (90 NY2d 57, 69, supra).
Thus, at this Court’s explicit suggestion, the Legislature, in chapter 390 of the Laws of 1997, removed the defects of the second statute, particularly the singular focus and effect of the definition of municipality (see, id.). It cannot be denied that chapter 390 does not limit the effect of its remedial authorization to the Village of Kiryas Joel alone; it definitionally expands the reach of the statutory authorization to at least one actual, additional secular entity, and countless potential others.
The Court is unanimous that, in ruling on chapter 390, this Court is bound — until the Supreme Court specifically chooses to further recalibrate or overrule Lemon — to apply the Establishment Clause principles promulgated in Agostini. Our application, however, of Agostini’s version of the Lemon test leads us as dissenters to the conclusion that chapter 390 has a clear secular purpose. It provides a “mechanism by which the governing body of a municipality can initiate the process of forming a school district” (Governor’s Mem approving L 1997, ch 390, 1997 NY Legis Ann, at 259). Even the purpose of the original statute was to obtain the secular goal of educating the handicapped children of Kiryas Joel (see, Governor’s Mem approving L 1989, ch 748, 1989 NY Legis Ann, at 324-325; Grumet v Board of Educ. of Kiryas Joel Vil. School Dist., 81 NY2d 518, 550, supra [Bellacosa, J., dissenting]).
Further, the government “aid” here does not have the effect of advancing religion. Quite to the contrary, it simply grants permission to any qualifying municipality to create its own public school district. After Agostini, it is no longer presumed that improper religious indoctrination will occur even in a parochial school sectarian setting (see, Agostini v Felton, supra, at 223). Thus, no justification exists for the conclusion that the public school district at issue, which is coterminous with the boundaries of the Village of Kiryas Joel, will function any differently from any other public school district. Indeed, the record of the Kiryas Joel School District shows scrupulous adherence to secular personnel, administration, syllabi, and teaching methods — and equally scrupulous avoidance of sectarian, religious instruction or indoctrination.
*702 The direct “aid recipients” here are any qualifying municipalities. They are defined without reference to religion and with reference only to neutral secular criteria that were emphasized in this Court’s previous adjudication concerning this intractable conflict. Indeed, the recognized population and wealth criteria are the typical factors used in effective legislation. Pursuant to Agostini, courts must accord weight to the neutrality of these qualifying factors as evidence that no improper effect or endorsement of religion occurs (see, id., at 231). Also, it is entirely appropriate to acknowledge the ultimate “aid recipients” — handicapped children in need of special, secular education.
Finally, no excessive entanglement is engendered by chapter 390. “[T]o assess entanglement, we have looked to ‘the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority’ ” (id., at 232 [citations omitted]). Here, the institutions initially benefitted are municipalities conscientiously endeavoring to serve their constituents, and the Village of Edryas Joel is such an incorporated municipality. Contrary to a fundamental fallacy expressed in the Majority’s analysis (majority opn, at 694), the resulting relationship is not between government and a religious entity, but between the State and its municipal subdivisions, which includes the Village of Edryas Joel. The State can provide “aid” in the form of a new school district for any qualifying municipality, much as it can now provide preAguilar “aid” to any qualifying parochial school.
The Supreme Court exercised care in Agostini to extricate its jurisprudence from its own misstep and to explicate the current state and sophisticated nuances of Establishment Clause precedents. However, the Majority here, in effect transforms the Agostini lesson into an instrument of unremitting invalidation of State legislation.
IV.
It is necessary to address some specific and key differences that we have with the Majority’s multi-faceted rationale. First, a fundamentálly flawed reliance is placed on an examination of whether this statute provides an impermissible accommodation of religion. A corollary of the Majority’s inquiry in this regard searches for whether a sufficiently “broad spectrum” of groups is benefitted. Further, the constitutional, analytical mix pivots off the legislative “history” and “origin” of the statute *703 (majority opn, at 695, 696); that is a faulty starting point. Finally, the Majority’s invocation of the possibility of a renewed availability of the pre-Aguilar municipal options is wholly inapplicable (contrast, Marbury v Madison, 1 Cranch [5 US] 137 [1803] [on the establishment of the seminal doctrine of judicial review, within limitations, however, of the fundamental separation of powers doctrine]).
A. Religious Accommodation
The Majority chooses to follow an analysis performed earlier by the United States Supreme Court in Kiryas Joel I, without the subsequent enlightenment of Agostini, because the “facts and issues” before this Court are more similar, as they see it, to those addressed in Kiryas Joel I (majority opn, at 692). However, the Majority ignores the critical fact that the statute now at issue is significantly different from the statute struck down in Kiryas Joel I. It had specifically named the Village of Kiryas Joel as the sole beneficiary of the first legislative effort. Under that structure, as this Court and the Supreme Court discerned, there was simply no guarantee that any other similarly situated group would garner the same benefits (see, Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet, 512 US 687, 703, supra). The initial statute constituted an impermissible accommodation because it transferred political authority directly to a single religious group (id., at 706).
In finding an impermissible accommodation under the initial statute, the Supreme Court contrasted the statute with the “neutral” Village Law under which Kiryas Joel had incorporated (id., at 703). Significantly, this law permits any group meeting certain “population and area requirements” to incorporate (Village Law § 2-200). It cannot be denied that chapter 390 also utilizes such neutral population and area requirements to transfer political authority to any qualifying municipality. Thus, the new statute has corrected the aspects of the legislation that failed the accommodation analysis in Kiryas Joel I, and the Majority nevertheless interposes a reconstituted standard in this regard.
This shaky accommodation concern incorporates another facet of the Majority view that we dissenters view differently — the reliance on something dubbed a sufficiently “broad spectrum” standard. Besides being precedentially unsupportable, the resulting inquiry demonstrates the “moving target” and “slippery slope” nature of the latest invalidation test. For example, no court ever proposed that the problem with chapter 390 could be solved by making it apply to other religious groups. Yet, the Majority now suggests that the application to *704 secular, as well as religious groups, is not enough. If the statute does not apply to a sufficiently “broad spectrum” of religious groups, then the Majority concludes that it has the impermissible effect of advancing one religion over others — an impermissible accommodation (see, majority opn, at 695). That is plainly wrong.
B. Sufficiently “Broad Spectrum” Standard
The Court propounds today that chapter 390 is not a permissible accommodation because the class benefitted by it is “anything but broad” (majority opn, at 695). Ancillary to this determination is the discrete objection that the eligibility requirements of the statute are “so narrowly drawn” as to prevent other similarly situated groups from qualifying for the statute’s entitlements.
Initially, this inverted analysis ignores the presumption of constitutionality beyond a reasonable doubt. It also devalues the constitutional burden into a mere counting exercise. Under the standard presumption of constitutionality, the challengers against chapter 390 must bear the burden to demonstrate the practical impossibility of any general application of the legislation. Challengers did just that in Kiryas Joel II. Quite differently here, the Majority’s insistence upon a showing that chapter 390 immediately applies to a sufficiently “broad spectrum” of existing municipalities effectively switches the judicial review standard into a presumption of unconstitutionality. Moreover, it shifts the burden of overcoming the transformed standard onto the defenders of the constitutionality of the statute.
While not expressly so stated, the Majority’s concerns here appear to stem largely from some apprehension that the State action inhering in chapter 390 will be perceived as an endorsement of Satmar Hasidism (see, infra, at 707). This concern was first reflected by this Court in Kiryas Joel I, which referenced School Dist. of City of Grand Rapids v Ball (supra). After Agostini, however, Ball and the perception of endorsement no longer provide the dispositive force that the Majority’s rationale gives it under the guise of the “broad spectrum” requirement. The Majority flatly refuses to credit the neutral criteria of the statute itself because of a pre-determined concentration on its perceived sense of advancement of one religion over another.
Even if the proponents had to meet this amorphous constitutional standard, we note that it is not surprising that a sufficient population or wealth shift has not occurred over the short span of the statute’s existence so as to allow the immedi *705 ate qualification of more municipalities. Nor is it remarkable that no potential groups have yet undertaken the process of incorporating in order to pursue the benefits of a statute, the constitutionality of which has remained mired in controversy and litigation. The Majority’s constitutional barrier — the impermissible accommodation due to an insufficiently “broad spectrum” of religious groups — cannot be dispositive or be given the prevailing weight that a constitutionality-reviewing Court inaptly confers in this case.
Furthermore, precedent does not support the application of this theory. Indeed, after Agostini, courts specifically need not look at how many religious or nonreligious groups benefit from a statute or challenged State action (see, Agostini v Felton, supra, at 229-230). Even if we were to recognize and conduct that analytical step, the current practical effect of chapter 390 is that it is equally applicable to sectarian, as well as nonsectarian, municipal assemblages.
The Majority cancels chapter 390 because it may presently be available to only two municipalities — one undeniably secular in every sense of the word. This contradicts relevant and longstanding precedent and legislative practices in this respect, as well as the expert proof adduced by the proponents of the enactment and expressly adopted by the Governor in signing the bill into law (see, Governor’s Mem approving L 1997, ch 390, 1997 NY Legis Ann, at 259 [“Data provided by the State Education Department show ten municipalities throughout the State which are currently eligible to form school districts under the criteria set forth in this legislation, in addition to those that can become eligible in the future”] [emphasis added]; see also, Matter of Wolpoff v Cuomo, 80 NY2d 70, 79, supra). If the mere fact that the source for chapter 390 is traceable originally to one municipality becomes a litmus test of constitutional dimension, the State would have many fewer statutes on its books and the courts can look forward to a lot more legislative review business on that challenge basis.
This Court has repeatedly upheld legislation which has an initial effect on only one municipality so long as the statute, on its face (with the formidable presumption of constitutionality also going for it), is general enough that application to other municipalities is real and available prospectively (see, Matter of McAneny v Board of Estimate & Apportionment, 232 NY 377, 392-393; see also, Hotel Dorset Co. v Trust for Cultural Resources, supra, at 373). That is the nucleus and thrust of much programmatic, remedial legislation. At the very least, “there is *706 no conclusive presumption to the contrary” (Matter of McAneny v Board of Estimate & Apportionment, supra, at 393).
Thus, this Court’s Kiryas Joel II decision establishes an uncontestable “given” for the review of chapter 390 — that the core requirement of a constitutional statute is that it must apply to other municipalities (see, Grumet v Cuomo, 90 NY2d 57, 75, supra). This one now does. Yet, the Majority substitutes a judicial, quantitative arithmetic analysis for the policy-empirical calculus that was used by the Legislature and the Governor (see, Matter of Wolpoff v Cuomo, supra).
Also uncontested is the fact that it was perfectly proper for the citizens of Kiryas Joel to take advantage of State legislation that created the Village that exists today. This is “a right that New York’s Village Law gives almost any group of residents who satisfy certain procedural niceties” (see, Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet, 512 US 687, 691, supra). Indeed, it probably would have been unconstitutional to deprive these citizens of their right to incorporate simply because the geographic boundaries allowed a Village to be formed consisting solely of members of the same religious beliefs.
Once again, that very municipality similarly seeks to secure and take advantage of other generally applicable legislation. The Majority’s decision today essentially, functionally and virtually forever forecloses this right for the citizens of the Village of Kiryas Joel; it deprives them of the opportunity afforded by chapter 390 simply because the civic Village is the first municipal group to utilize the statutory enablement. Were other municipalities to precede Kiryas Joel in opting in under this legislation, just as other communities incorporated themselves as villages prior to Kiryas Joel, the courts would lack the power under the Establishment Clause to deny Kiryas Joel the same statutory benefit. It is sadly ironic that the Legislature’s overture to assist the handicapped children of this Village, who require special secular education needs, is again struck down simply because the children happen to be members of the Satmar Hasidim community within a duly incorporated civic Village.
C. Legislative History/Origin
The Majority’s references to legislative history and origin (majority opn, at 695, 696) undercut the tripartite system of governance, as well as sound constitutional theory. This approach implies that, because the Legislature has previously made mistakes, it cannot successfully cure its flaws. Under this novel *707 postulate, initial legislative missteps will always emerge from buried stages to haunt legitimate, future efforts.
We respectfully suggest that it is at least equally necessary for the courts to place “history” and “origin”, by whatever characterization, in context and to interpret a law as it is written. Instead, the Majority emphasizes that in its draft stages, the bill has been referred to as “Kiryas Joel No. 3” (majority opn, at 695), as though that title carried a constitutional infirmity, rather than simply reflecting the current legislative practice of attaching easily recognizable names to bills for better and broader understanding.
Here, the statute was, indeed, a “direct response to Kiryas Joel II” (majority opn, at 695). Considered from a neutral perspective, we view this fact as supportive, rather than destructive, of the legislative effort. This law, after all, is the result of a concept that has thrice received the deliberative action of both Houses of the State Legislature, two Governors of opposing political parties and has been shaped by decisions of the highest courts of this State and of the United States.
Further, if this Court ever thought that the “history” of this matter would be a perpetual albatross carried through all later drafts and enactments, then it should not have opened the window of a possibly acceptable theory of constitutionality (see, Grumet v Cuomo, 90 NY2d 57, 75, supra). Naturally, the Legislature pointedly and respectfully responded; we believe it did so successfully and constitutionally.
Ironically, the Majority’s rejection of chapter 390 fosters a tautological chase that the more the Legislature tries to accommodate concerns adjudicated by the Courts, the more the legislative cause is doomed by its ontology. No matter how many times the other two Branches of State government try to eradicate the Judiciary’s perceived and delineated constitutional impediments, the effort loses, rather than gains, ground. D. The pre-Aguilar Option
The Majority finally urges that chapter 390 offends the neutrality mandated by the First Amendment because, in view of Agostini, Kiryas Joel may have an alternative means by which to provide its education services (majority opn, at 696, 697) — again, an unsupportable “perception of endorsement” concern (see, supra, at 704). This mandate turns the constitutional analysis upside down. It does not control the constitutionality of the statute at issue, nor is it appropriate to this Court’s analysis in this setting. This reliance on an abstract, premature *708 option is, at best, advisory, and, at worst, it contradicts the legitimate presumption of constitutionality of the instant statute and creates an improper judicial balancing act in scrutinizing the constitutionality of the statute that was actually enacted (see, supra, Part I). Indeed, the very fact that the MonroeWoodbury School District is a party urging the constitutionality of chapter 390 more assuredly reflects that the pre-Aguilar system is not even a realistic option, no less a pre-judged constitutional one.
This judicial musing is inappropriate. To support its theory, the Majority weakly relies on rhetoric from the losing side of the debate in the Legislature. This unlikely source simply cannot trump the overarching separation-of-powers presumptions by which this Court must be governed in ruling on the constitutionality of chapter 390 — the only enactment and issue before this Court at this time.
Finally, we generally agree with the Majority’s exhortation that the two sides “make every effort” to reach an accord (majority opn, at 697) as that would be a most decorous solution to any litigation. In view of the history of this case, however, this proposal is particularly precatory. In the end, the role of this Court is to decide the case presented and establish the guiding precedent based on careful, precise constitutional analysis.
V.
The intractable drama of this dispute has a David and Goliath staging to it — yet, it is difficult to decide who will be left standing in the end as the true victor or hero. This profound conflict represents a third constitutional crossroads for this Court and a potential fact pattern for a second review by the Supreme Court of the United States. The realm of Establishment Clause jurisprudence remains particularly conflicted as evidenced by this case. Until Agostini, cases seemed to increase the tension between the Constitution’s traditional and fundamental guarantees of free exercise of religion and free association. Much remains unsettled, but, in one sense, Agostini provides a potent lesson that it is not un-American or unconstitutional to refuse to be absorbed into the melting pot.
The civic and legal activity of this Hasidic community has been challenged through successive litigations for daring to go so far as to exercise a right to petition government repeatedly for redress. These citizens simply took their place in the long line of supplicants walking and working the corridors of power *709 in the Statehouse. In this respect, they paradoxically conformed to society’s methods. The core of objection against this minority community, through this and previous litigation, is that they have been too successful in not giving up their quest to gain the open and official attention of the Executive and Legislative Branches of government. Their perseverance and that of the Legislature and Governor are turned topsy-turvy into an instrument of invalidation of the lawmaking product of the other two Branches. This nullification is unwarranted and persuades us to dissent and vote to reverse and declare chapter 390 constitutional.
Chief Judge Kaye and Judges Ciparick and Rosenblatt concur with Judge Smith; Judge Bellacosa dissents and votes to reverse in a separate opinion in which Judges Levine and Wesley concur.
Order affirmed, with costs.