OPINION OF THE COURT
Ralph T. Gazzillo, J.
By notice of motion, counsel for the defendant has made an application which seeks dismissal of this matter; in the alternative, the application seeks suppression of certain evidence, as well as some ancillary relief. The motion, which has been vociferously opposed by the prosecution, is decided as follows:
The issues presented for determination are essentially legal and not factual. Indeed, and at least for the purposes of this application, the underlying facts are not presently in dispute and may be briefly outlined.
The defendant was arrested for "Driving While Intoxicated” at approximately 1:35 a.m. on February 25, 1995. Within an hour of the arrest, he voluntarily submitted to a chemical analysis of his breath after receiving the standard, so-called "refusal warnings” (see, Vehicle and Traffic Law § 1194 [2]), i.e., the anticipated consequences of a refusal to submit to a test.[1] The test resulted in a .18 BAG and, after completion of the test and the other arrest procedures, the defendant was held in police custody until his mid-day arraignment before this court. During the arraignment, and in accordance with Vehicle and Traffic Law § 1193 (2) (e) (7), two findings were made: (a) the accusatory instruments conformed with GPL 100.40 and (b) the defendant had operated a vehicle while hav *262 ing a .10 of 1% or more by weight of alcohol in his blood. Pursuant to those findings and the cited section, the defendant’s driver’s license was ordered suspended pending his prosecution. Following the arraignment, he was released in his own recognizance and on the return date, March 1, 1995,[2] the defendant made an application for a "hardship license” pursuant to Vehicle and Traffic Law § 1193 (2) (e) (7) (e); after a hearing, the application was granted.
Against that backdrop, and founded upon claims of "double jeopardy”, the defendant’s instant motion seeks the dismissal of the criminal action. In the alternative, he seeks suppression of the test results, claiming his consent was involuntarily and unknowingly given.[3]
DOUBLE JEOPARDY
With respect to the "double jeopardy” branch of the application, the defendant initially contends "that the suspension and subsequent hardship hearing constituted a separate and independent proceeding which resulted in 'punishment’ to [him].”[4] As such, he further contends, it is barred by the "double jeopardy clauses” of the United States and New York Constitutions. Thereafter, and after citing a number of recent Federal cases,[5] he urges that a two-stepped analysis is required, i.e.: "a determination of the Double Jeopardy issue in the case at bar requires a resolution of two issues. First, does the judicial licensing suspension and subsequent criminal prosecution constitute separate proceedings? And, does the licensing suspension pursuant to Vehicle and Traffic Law § 1193 (2) (e) (7) constitute a 'punishment’ as defined by the U.S. Supreme Court? If the answer to both of these questions is affirmative, then the current prosecution can only be seen as a successive attempt to *263 impose punishment and thus is a violation of the Double Jeopardy Clause.”[6]
The prosecution’s response, based upon a number of grounds, strenuously opposes the application.
Preliminarily, it should be noted that the procedures authorized by Vehicle and Traffic Law § 1193 (2) (e) (7) became effective on November 1, 1994. At this early stage of the statute’s evolution, and beyond purely persuasive authority, there is little case law which can be considered definitive. Indeed, neither the court nor the parties have discovered any mandatory authority which controls the facts of the matter at bar. Therefore, for the purposes of this analysis, and before shifting to the above-indicated standards urged by the defendant, the focus begins with the statutory genesis of the suspension procedure, i.e., Vehicle and Traffic Law § 1193 (2) (e) (7).
That statute, as with all statutes, is not immune from assault but clearly surrounded by a formidable cloak. Indeed, as stated a number of times by our Court of Appeals, "[t]here is a simple, but well-founded, presumption that an act of the Legislature is constitutional and this presumption can be upset only by proof persuasive beyond a reasonable doubt.” (Hotel Dorset Co. v Trust for Cultural Resources, 46 NY2d 358, 370 [1978] [citations omitted].) Any attempt to overcome that presumption is, obviously, an ambitious undertaking; while not offhandedly dismissed, it is also not casually granted.
In an attempt to shoulder that burden, the defendant has framed the issue in the above-indicated two-stepped fashion. That suggestion was, no doubt, a product of the analysis found in Ohio v Gustafson (94 LWUSA 1177 [Mahoning County Ct 1994]), one of the cases he cites as supportive of his application.
As previously indicated, however, no case cited by either side — including the Gustafson decision (supra) — totally controls the instant matter. Moreover, while the defendant’s collection of cases includes a number of Federal citations,[7] a reading of those cases demonstrates that their facts are manifestly distinguishable from those at bar. Indeed, each case addresses the question of the continued viability of two proceedings, when both proceedings essentially arise from related if not common facts, but which are thereafter separately and individually prosecuted in two distinct courts, i.e., one civil and one criminal. That clearly is not the case at bar.
*264 Additionally, with respect to the other two non-Federal cases primarily relied upon by the defendant, Gustafson (supra) as well as Florida v Reilly (95 LWUSA 16, July 16, 1995 [Broward County Ct 1994]), it is clear that the local procedures therein analyzed, while perhaps not totally alien to that authorized within this State, are demonstrably distinguishable. For example, it appears that in the Gustafson case the defendant therein was first "punished” (paraphrasing the defendant at bar’s arguments) when his driver’s license was suspended by the Ohio State Highway Patrol during the arrest’s processing, i.e., prearraignment. Thereafter, when the "DWI” action was commenced in the Ohio criminal court, he was placed in jeopardy of a second "punishment”. So too with the Reilly decision. In that case, it appears that the Department of Highway Safety and Motor Vehicles "punished” the defendant driver when that agency suspended the license; and he was also exposed to an additional, second "punishment” in the Florida criminal court. In both Gustafson and Reilly, therefore, local procedures authorized a preliminary but clearly extrajudicial "punishment”/suspension which was independent of the criminal proceedings (as well as any additional "punishment” which might follow in those other, criminal proceedings).
The procedure authorized by this State’s statute is distinct. First and foremost, the issue of initial suspension is addressed by the court and, quite obviously, after commencement of the criminal action; specifically, during the arraignment aspect of the criminal action. Any subsequent proceedings, including but not limited to the "hardship hearing” as well as any final sentencing proceedings, are again conducted by the court and, once again, within the course of the same criminal action. Stated otherwise, the New York procedure visa-vis "DWI’s” embraces a number of proceedings, but all of which flow from, and are parts of, the same criminal action, conducted in and by the same court under the same caption and docket number. While portions of the procedure may be viewed as "different” aspects of one criminal case and might therefore be viewed as "separate proceedings” from each other, they are undeniably within the embrace of the underlying action and are not independent of it.
Nor does this result change because a defendant, preliminarily and prior to the conclusion of the criminal case, might be "punished” while still potentially in jeopardy for the underlying crime. Juxtaposing the analysis to any, typical criminal *265 matter, starting from arraignment and continuing through the course of the case, it is clear that a court has (and retains) the authority to severely limit a number of rights which have, rightfully and historically, been jealously guarded and considered part of the very fabric of our system. For example, virtually anytime during a criminal matter the court may direct that a defendant be held on bail (or no bail), or that pursuant to an order of protection, he or she stay away from his or her own home. (See, e.g., CPL art 530.) Such orders may issue, notwithstanding the ominous strength and vitality of the presumption of innocence, without benefit of a trial (jury or nonjury), without sworn testimony, and upon proof which may rise to something less than "beyond a reasonable doubt”. (Id.) And, quite obviously, this may be ordered while the defendant simultaneously remains in jeopardy of a second "punishment”, i.e., the potential sentence for the underlying criminal charge. There is no doubt, however, that such actions do not trigger viable claims of "double jeopardy”. (See, e.g., United States v Grisanti, 4 F3d 173 [2d Cir 1993], and cases cited therein.) Thus, the instant defendant’s analogous arguments in this regard are neither totally novel nor talismanic.
Lastly, and so it is abundantly clear, whether in the context of the first or second prong of the proffered two-step analysis, the court is equally disinclined to view the suspension as "punishment”. In so determining, the court has, at the suggestion of the defendant, reviewed the Governor’s Memoranda accompanying his approval of the statute and which has been provided by defense counsel. As noted therein, the legislation was perceived as "balancing the public’s interest in highway safety” with the defendant’s rights and "keeps the potentially dangerous driver off the road.” (Governor’s Mem approving L 1994, ch 312, 1994 McKinney’s Session Laws of NY, at 2972.) In the opinion of this court, the amendment is, therefore, remedial.
Moreover, and as underscored by the prosecution’s response, a review of the suspension authorized by Vehicle and Traffic Law § 510 is instructive as it is suitably analogous to that contained in the new section. The former section, as the People pointedly emphasize, contains a suspension procedure which has been found "remedial” and therefore not a "punishment” by no less than this State’s highest Court. (Matter of Barnes v Tofany, 27 NY2d 74 [1970].) In its determination, the Barnes Court opined that, "suspension or revocation of the privilege of operating a motor vehicle is essentially civil in nature, having *266 as its aims chastening the errant motorist, and, more importantly, the protection of the public from such a dangerous individual.” (Supra, at 78 [emphasis supplied].)
It is of no minor significance that the words of the Barnes decision (supra) were somewhat echoed by the Chief Executive in his Memoranda accompanying the amendment of Vehicle and Traffic Law § 1193 (2).
In view of the Barnes Court’s findings as well as the Governor’s Memoranda’s remarks, and in the absence of controlling authority to the contrary, the same result obtains after analyzing Vehicle and Traffic Law § 1193 (2) (e) (7).
It is, therefore, the determination of the undersigned that the defendant has not satisfactorily met his burden in demonstrating the unconstitutionality of Vehicle and Traffic Law § 1193 (2) (e) (7). On the grounds raised, his motion for dismissal is, therefore, denied in all respects.
SUPPRESSION
As indicated above, the second aspect of the defendant’s motion seeks to suppress certain evidence, viz., the intoxilyzer test results. In this regard, the defendant contends that his consent to the test was involuntarily obtained. In support of this contention, he submits that while he may have been advised of the consequences of a refusal to be tested, he was not advised of the consequences which would follow testing. Otherwise stated, it is the defendant’s contention that because he was merely informed of what would happen if he refused the test, but not what would happen if he submitted to it, his consent was neither knowing nor voluntary. As a result, he demands suppression of the test results.
In opposing the relief requested, the prosecution does not argue with the defendant’s rendition of the preliminary facts; it does, however, steadfastly deny that those facts require suppression.
In simplest terms, therefore, the issue is framed as follows: For purposes of this analysis, there is no contest as to the timeliness of the defendant’s submission to the intoxilyzer nor, of and by itself, the sufficiency of the "refusal” warning. The question presented is: Does the fact that the defendant was not warned of the consequences of submitting to the intoxilyzer render his decision "involuntary” and therefore preclude its admission at trial?
Focusing on this question, it should be initially noted that, as presented, the issue (as with the "double jeopardy” issue *267 discussed above) is more one of law than fact. Once again, however, there does not appear to be any authoritative or definitive answer to the question. Finally, and still once again, neither the parties nor the court’s independent research has produced any such authority and all have sought guidance from other authorities.
As to those authorities, the analysis begins with the well-established principle that there is no constitutional privilege to refuse testing. (People v Thomas, 46 NY2d 100 [1978].) Notwithstanding that rule, testing has, of course, been the subject of much litigation and clarification. Indeed, in the recent case of People v Atkins (85 NY2d 1007), the Court of Appeals revisited an aspect of the law applicable to testing. As indicated therein, the issue before that Court was the effect of an otherwise "untimely” consent to a blood test. While that case is clearly not determinative vis-a-vis the matter at bar, it is sufficiently instructive. For example, both the majority as well as the dissent of Atkins predicated their respective opinions with abbreviated reviews of the development of the concept of "deemed consent” now codified within the Vehicle and Traffic Law, specifically section 1194 (2). That statute states in relevant part that "[a]ny person who operates a motor vehicle * * * in this state shall be deemed to have given his consent to a chemical test of * * * [his] breath” (id. [emphasis supplied]). As a result, and as succinctly stated by the Atkins dissent, "deemed consent” effectively renders "all testing * * * Voluntary’ or * * * consensual” and "provides the driver with an opportunity to affirmatively withdraw that consent, upon being informed of the consequences of that withdrawal” (People v Atkins, supra, at 1011 [Simons, J., dissenting]).
With respect to the instant matter, the defendant — as an operator of a motor vehicle in this State — was deemed to have consented to testing with but one caveat: just prior to testing, he must be advised of the consequences of a withdrawal of his consent and afforded the opportunity to "affirmatively” do so. He was so advised; he chose not to withdraw his consent. That was sufficient to satisfy the law. To add a further element, i.e., that a driver be required to reaffirm his previously given consent, with or without a warning of the consequences, is to misstate the law.
Furthermore, and if, arguendo, the defendant were accurate in his contention that a "knowing” and "voluntary” consent to be tested can only follow a warning of the consequences, it would follow that he would, presumably, also have to be ad *268 vised of all of the potential consequences. While the first portion of that theory may be conceptually appealing, it is undercut by the impracticality and unreasonableness of the second portion. For example, there are a number of consequences (and permutations of those consequences) when a driver submits to testing. Quickly perusing the Vehicle and Traffic Law, and depending upon the reading as well as the defendant’s background, the following are a number of the potential alternatives of the "BAG” reading: (a) more than .05 but no more than .07 of one percentum or less, it is prima facie evidence that he is not intoxicated, but relevant, but not prima facie evidence of his being impaired; (b) more than .07 but less than .10, it is prima facie evidence as to his being impaired, but not intoxicated; (c) .10 or more, evidence of intoxication, and (d) .10 or more and if the driver has, within the preceding 10 years, a prior conviction[8] for the same crime (or a litany of other crimes), it may be a felony; lastly, and blending the reading as well as the driver’s prior convictions[9] and/ or his or her age, he or she may risk suspension or revocation of his licence. (Vehicle and Traffic Law § 1193.)
Moreover, as indicated, "impaired” and "intoxicated” are distinguished by mere fractions of percentages. On countless occasions, courts have heard the testimony of trained and experienced police officers who initially and fully expected a test to demonstrate "intoxication” but witnessed tests which supported no more than "impaired”.
To expect the typical, layperson and perhaps totally inexperienced driver[10] to be able to sufficiently "know” or reasonably anticipate the test’s outcome so that any consent would be considered fully "knowingly” given is, at best, unrealistic. And any such omnibus warning which embraces all of the consequences would be a surrender to form as opposed to substance.
Similarly, a bare-bones warning (i.e., "If you submit to the test, any reading of .10 or above may result in license suspension”) might prove equally unsatisfactory. While comparatively simple and somewhat staightforward, it not only does not address all of the options, but it still assumes the lay driver *269 would be capable of anticipating the probabilities so as to make it a "knowing” decision.
It is, therefore, the finding of the undersigned that, under the facts as presented, the defendant operated a motor vehicle in this State; he therefore consented to the test. Thereafter, he was given warnings consistent with the existing law as well as the opportunity to revoke his consent; he chose not to avail himself of that opportunity and voluntarily submitted to the test. Accordingly, the defendant’s application for suppression of the test results is denied in all respects.

. Parenthetically, but of importance to the defendant’s suppression demand, it should also be noted that neither side alleges nor implies that the defendant was advised of any of the consequences that might follow consensual submission to a test; for the purposes of this motion, it is therefore assumed that no such advice was given.

. The third "business day” following his arrest. (See, Vehicle and Traffic Law § 1193 [2] [e] [7] [e].)

. In view of the fact that the defendant’s motion attacks the constitutionality of Vehicle and Traffic Law § 1193, he also sought an order pursuant to Executive Law § 71 inviting the intervention of the Attorney-General of New York State. That order was issued by the undersigned but, by letter dated March 17, 1995, Andrea Green, Deputy Solicitor General, Appeals and Opinions, indicated that the Attorney-General did not intend to intervene.

. Affidavit of Kevin J. Cummings, Esq., Mar. 7, 1995, at 2.

. Department of Revenue of Montana v Kurth Ranch, 511 US —, 128 L Ed 2d 767 (1994); Austin v United States, 509 US 602 (1993); United States v Halper, 490 US 435 (1989).

. Affidavit of Kevin J. Cummings, at 3-4.

. See, n 4.

. Presumably, this information would be accessible to law enforcement personnel; but it would be needed within the typical testing period of two hours. (Vehicle and Traffic Law § 1194 [2] [a] [2].) To expect compliance with that second requirement is, at best, overly optimistic.

. Ibid.

. Who, parentically, may or may not be under the influence of alcohol.