OPINION OF THE COURT
Marylin G. Diamond, J.
The instant action arises out of a dispute between the City of New York (the City) and the Patrolmen’s Benevolent Association of the City of New York (the PBA), which represents nearly 35,000 New York City police officers, as to the manner in which their collective bargaining disputes are to be resolved. The City seeks a declaratory judgment declaring unconstitutional section 1 of chapter 13 of the Laws of 1996 (Section 1), which enables the State’s Public Employment Relations Board (PERB) to invoke its jurisdiction when collective bargaining negotiations between the City and its police officers reach an impasse. The City also seeks a judicial declaration that section 2 of chapter 13 (Section 2), which amended subdivisions (2) and (4) of Civil Service Law § 209 by repealing New York City’s exemption from PERB’s jurisdiction over collective bargaining negotiation impasses between the City and its firefighters and police officers, does not divest the New York City Board of Collective Bargaining (the BCB) of its jurisdiction over collective bargaining negotiations between the City and the PBA.
Statutory Framework
In 1967, the Legislature enacted the so-called "Taylor Law”, Civil Service Law §§ 200-214, in an attempt to provide an effective tool to avoid the recurrence of crippling labor strikes by public sector employees similar to those which occurred during the late 1960s. The Taylor Law provides a comprehensive framework for regulating collective bargaining between public employers, and the certified and recognized representatives of their employees so as: "to promote harmonious and cooperative relationships between government and its employees and to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government” (Civil Service Law § 200). The Taylor Law created PERB to assist in resolving disputes between public employers and their employees (Civil Service Law § 205). PERB’s jurisdiction over such disputes, however, is not exclusive. The Taylor Law also permits localities to create neutral local governmental bodies *569 (commonly known as mini-PERBs) to govern public employment relations between a locality and its unionized employees (Civil Service Law § 212 [1]). If a locality chooses to create a mini-PERB, Civil Service Law § 212 (1) specifically exempts the local mini-PERB from PERB’s jurisdiction and its impasse procedures under Civil Service Law § 209. A locality, however, must submit to PERB its local provisions creating its miniPERB for PERB’s prior "substantial equivalency” determination before such local provisions become effective (Civil Service Law § 212 [1]). However, Civil Service Law § 212 (2) exempts the City from obtaining prior PERB approval of its mini-PERB provisions, which under this subdivision are presumptively deemed to be within PERB’s "substantial equivalency” requirement absent a judicial declaration to the contrary.
The City has opted to create its own mini-PERB, the New York City Office of Collective Bargaining (the OCB) (NY City Charter §§ 1170-1177; Administrative Code of City of NY §§ 12-301 — 12-316; 61 RCNY 1-01 — 1-15). The BCB is a constituent part of the OCB (NY City Charter § 1171). The OCB and the BCB have jurisdiction over the labor relations of all mayoral agencies, which include the New York City Police Department (Administrative Code § 12-304). Nassau, Suffolk, and Westchester Counties, the Town of Hempstead and the Syracuse City School District have also opted to create their own miniPERBs.
The Undisputed Facts
On March 31, 1995, the City’s collective bargaining agreement with its police officers expired. As required by the City’s Collective Bargaining Law (see, Administrative Code § 12-311 [d]) and the collective bargaining agreement, the police officers continue to work under the terms of the expired contract and are required to continue to do so until a successor contract is executed.
On November 28, 1995, James F. Hanley, Acting Commissioner of Labor Relations of the City of New York (Hanley), wrote to PBA president Louis Matarazzo (Matarazzo) requesting that Matarazzo enter into negotiations with the City concerning a new collective bargaining agreement. There was no response to Hanley’s letter. On January 4, 1996, Hanley again wrote to Matarazzo requesting that contract negotiations commence and asked that Matarazzo call his office "at [his] earliest convenience to schedule a bargaining session.” Again, there was no response.
*570 There were no official collective bargaining negotiations at any time prior to the November 28, 1995 correspondence to Matarazzo (see, James J. Lysaght Feb. 14, 1996 letter to PERB [the PBA takes "the position that at all times it was ready and willing to negotiate, and that the City, on the other hand, expressed absolutely no desire to negotiate, since it wished to await the outcome of collective bargaining with other unions, including the United Federation of Teachers and District Council 37”]).
On January 23, 1996, the City filed with the BCB a "Request for Appointment of Impasse Panel” claiming that "negotiations have been exhausted and conditions are appropriate for the naming of an impasse panel” (the Impasse Panel Request), and also claimed that: "The [PBA’s] conduct, particularly in light of the long delay that has occurred since the expiration of the previous collective bargaining agreement, constitutes nothing less than an absolute refusal to bargain on the part of the PBA. Clearly an impasse exists between the parties.” Simultaneous with this filing, the City also filed an improper practice petition with the BCB alleging that the PBA had delayed the start of bargaining for a successor contract in violation of Administrative Code § 12-306 (c) (l)-(3) (the Improper Practice Petition). The City sought injunctive relief directing the PBA to begin immediate negotiations on a new contract (61 RCNY 1-07 [Z]). On January 26, 1996, the BCB notified the City and the PBA that it had commenced investigations to ascertain whether statutory conditions for the appointment of an impasse panel had been met.
On January 8, 1996 legislation was introduced in Albany ostensibly designed to provide State-wide uniformity in the treatment of impasses arising in collective bargaining negotiations between the City and its police and firefighters (see, Jan. 24, 1996 Legis Debate, at 13). That legislation would permit PERB to invoke its jurisdiction and its impasse procedures when negotiations between the City and its police officers reach an impasse (see, L 1996, ch 13, § 1), and would permit the City or the certified representatives of its firefighters and police officers to request PERB’s assistance in resolving disputes between the parties that reach an impasse (see, L 1996, ch 13, § 2). The legislation passed both the Senate and the Assembly, and was presented to the Governor for his signature.
On February 9, 1996, Governor George E. Pataki vetoed the legislation based on his concerns about the legislation’s immediate effective date, the possibility of two-year impasse awards *571 despite the City’s four-year financial planning cycle, and the City’s ability to pay any award that may result. On February 12, 1996, the Legislature overrode his veto and enacted chapter 13 of the Laws of 1996.
Section 1 of chapter 13 provides that "[notwithstanding any other provision of law to the contrary, [PERB] may invoke procedures to be followed in the event of disputes which reach an impasse in the course of collective negotiations between the [City] and the New York city police.” Thus, Section 1 permits PERB to invoke its jurisdiction and its impasse procedures over the City and its police officers when their collective negotiations reach an impasse.
Section 2 of chapter 13 amends subdivisions (2) and (4) of Civil Service Law § 209 by repealing the City’s exemption from PERB and its impasse procedures under Civil Service Law §209.
Section 3 of chapter 13 provides that the law will take effect immediately, i.e., on February 12, 1996.
On February 14, 1996, just two days after the law’s enactment, the PBA’s counsel, James J. Lysaght (Lysaght), wrote to PERB requesting that PERB declare that the collective bargaining between the City and the PBA for a successor contract was at an impasse claiming: "The position the City has taken in these negotiations is that the PBA should accept a salary 'increase’ of 0% over the next two years, while the Union has demanded a salary increase of 50% in the first year. It is therefore clear that there is an intractable impasse over the most basic element of a successor contract. Accordingly, although the Union has at all times been prepared to go forward with good faith negotiations, we must now agree that there is an impasse, and accordingly, we request that PERB act, pursuant to the Laws of 1996, Ch. 13, which provides that either the City or the Union may petition PERB to declare that an Impasse exists and that upon a determination that an Impasse exists, that the Board shall refer the dispute to a public arbitration panel as provided in Civil Service Law § 209.4 (c).” Notwithstanding BCB’s investigation, which for the most part was delayed due to apparent scheduling conflicts, Lysaght wrote to the BCB requesting it to transfer the City’s Impasse Panel Request to PERB in view of the enactment of chapter
13. No mention was made of the City’s pending Improper Practice Petition before the BCB.
The City opposed the PBA’s requests, and maintained that the BCB had exclusive jurisdiction of the Impasse Panel *572 Request since it was filed before the February 12, 1996 effective date of the statute. Both the BCB and PERB advised the parties that they would hold the matter in abeyance based on the City’s representation that it would proceed expeditiously with its declaratory judgment action and attendant application for injunctive relief, and that the matter would continue to be held in abeyance pending an expeditious judicial determination of the City’s application for injunctive relief. On February 28, 1996, the City commenced the instant declaratory judgment action, and on March 8, 1996, applied for a preliminary injunction to maintain the status quo pending the outcome of the declaratory judgment action. Oral argument was heard on that application on March 28, 1996. The parties have stipulated that there are no material issues of fact. Therefore, the submissions will be treated as motions and cross motions for summary judgment.
Justiciability
Although the City of New York and the PBA both agree that the issues before this court are ripe for adjudication, PERB contends that, because neither it nor the BCB has determined that an impasse exists or has ordered the parties to arbitrate their purported dispute, the City’s constitutional challenge to Section 1 is premature, rendering it nonjusticiable. PERB relies on Uniformed Firefighters Assn. v City of New York (79 NY2d 236 [1992]), Village of Lynbrook v New York State Pub. Empl. Relations Bd. (48 NY2d 398 [1979]), Mount St. Mary’s Hosp. v Catherwood (26 NY2d 493 [1970]) and Park Ave. Clinical Hosp. v Kramer (26 AD2d 613 [4th Dept 1966], affd 19 NY2d 958 [1967]).
It is well settled that a declaratory judgment action is premature if the future event may never occur or is beyond the control of the parties (New York Pub. Interest Research Group v Carey, 42 NY2d 527, 529-530 [1977]; see also, Church of St. Paul & St. Andrew v Barwick, 67 NY2d 510, 518 [1986]). Equally well settled is the principle that a declaration is appropriate if it has an immediate practical effect on the conduct of the parties (New York Pub. Interest Research Group v Carey, supra, 42 NY2d, at 530).
The heart of the instant dispute is whether BCB or PERB has impasse jurisdiction. The City has sought the intervention of BCB while the PBA seeks PERB’s intervention to declare that the parties’ purported negotiations have reached an impasse. Thus, who has primary jurisdiction is precisely the *573 dispute this court is called upon to resolve (see, e.g., Matter of Prospect v Cohalan, 65 NY2d 867, 870 [1985]). None of the cases relied upon by PERB involves disputes concerning the proper administrative forum in which to place jurisdiction.
Absent a judicial declaration, the City and the PBA will continue to pursue their respective requests for an impasse declaration in two different fora, which may result in inconsistent administrative rulings. The City and the PBA could conceivably go through two separate impasse proceedings to arrive at two successor contracts, only to have one or both contracts challenged on the grounds that the administrative agency lacked jurisdiction to invoke its impasse procedures. Such a result would be wasteful, time consuming, and would adversely complicate these important labor negotiations. Such concerns are summarized in the Taylor Committee’s report to Governor Rockefeller with respect to passage of the Taylor Law: "As a result of * * * various ambiguities in the coverage, authority, and jurisdiction of OCB, a kind of no-man’s land now exists between OCB and [PERB] with respect to a significant number of public employers and public employee organizations in New York City. It is of crucial importance that these ambiguities be resolved and at the earliest possible date. Nothing could be more destructive of sound public employment relations than uncertainty and confusion as to which procedures, if any, are available and required to be invoked to resolve an impasse.”
Whether or not an impasse exists now or in the future can only properly be determined by the agency having jurisdiction, i.e., PERB or BCB, both of which have expertise to determine such issues. Therefore, it is necessary and appropriate for this court to rule now on the issues submitted which involve statutory and constitutional interpretations and which are ripe for adjudication. Judicial intervention in such circumstances is clearly warranted.
Home Rule
Article IX, § 2 (b) (2), the Home Rule provision of the New York Constitution, provides:
"(b) Subject to the bill of rights of local governments and other applicable provisions of this constitution, the legislature: * *
"(2) Shall have the power to act in relation to the property, affairs or government of any local government only by general law, or by special law only (a) on request of two-thirds of the *574 total membership of its legislative body or on request of its chief executive officer concurred in by a majority of such membership, or (b), except in the case of the city of New York, on certificate of necessity from the governor reciting facts which in his judgment constitute an emergency requiring enactment of such law and, in such latter case, with the concurrence of two-thirds of the members elected to each house of the legislature.”
Thus, under the Home Rule provision, the Legislature has the constitutional authority to act in relation to the locality’s "property, affairs or government” only by general law, which applies in terms and effect to all cities (NY Const, art IX, § 3 [d] [1]), or only by special law, which applies in terms and effect to one or more, but not all cities (NY Const, art IX, § 3 [d] [4]). The obvious intent of the Home Rule provision was to vest actual legislative power concerning local affairs with the cities, and to curb the Legislature from imposing unwanted laws upon them (Richland, Constitutional City Home Rule in New York, 54 Colum L Rev 311 [1954]). In analyzing the City’s Home Rule challenge one must be mindful that enactments of the Legislature, a co-equal branch of government, are presumed to be constitutional and those challenging such laws bear a heavy burden of proving unconstitutionality beyond a reasonable doubt (City of New York v State of New York, 76 NY2d 479, 485 [1990]; Hotel Dorset Co. v Trust for Cultural Resources, 46 NY2d 358, 370 [1978]).
The Home Rule provision grants the City greater constitutional protection against State intrusion than other localities. A special law can only be enacted affecting the City only if there has been a Home Rule message (NY Const, art IX, § 2 [b] [2] [a]). In contrast, a special law can be enacted affecting other localities without a Home Rule message if the Governor submits a "certificate of necessity” and two thirds of the Legislature concur (NY Const, art IX, § 2 [b] [2] [b]). Enactment of a special law relating to the City’s "property, affairs or government” does not always require a Home Rule message.
Although the PBA contends otherwise, chapter 13, § 1 is clearly a special law. A "special law” is one that applies in terms and effect to one or more, but not all cities. Chapter 13, § 1 is a special law because it makes PERB procedures applicable to disputes between the City and its police union, while leaving intact the right of other local governments such as Nassau, Suffolk, Westchester Counties, the Town of Hemp-stead and the Syracuse City School District to continue to opt *575 out of PERB’s jurisdiction. However, the fact that chapter 13 is a special law does not in and of itself mean that a Home Rule message is constitutionally required.
A special law that serves a "substantial State concern” is constitutional under the Home Rule provision even absent a Home Rule message from the City (see, e.g., Uniformed Firefighters Assn. v City of New York, 50 NY2d 85 [1980] [residential mobility of members of the civil service is a substantial State concern]; Hotel Dorset Co. v Trust for Cultural Resources, 46 NY2d 358, supra [substantial State concern involved in the preservation of financially troubled cuHural institutions and museums of the State]; Bugeja v City of New York, 24 AD2d 151 [2d Dept 1965], affd 17 NY2d 606 [1966] [a substantial State interest exists in ensuring payment by the City of New York of its mandatory retirement or pension liabilities]). What is gleaned from these cases is that while the Home Rule provision grants the City significant power and authority to act with respect to local matters nothing in the Home Rule provision is intended to impair the power of the Legislature to act in relation to matters of State concern notwithstanding the fact that the State’s concern may also touch upon the City’s property, affairs or government (Uniformed Firefighters Assn. v City of New York, supra, 50 NY2d, at 90).
The Constitutional Challenge
The City challenges Section l’s constitutionality on the ground that the law’s enactment without a Home Rule message violates the Home Rule provision of the State’s Constitution. The City correctly argues that if Section 1 is unconstitutional, Section 2’s amendment of Civil Service Law § 209, which removed the City’s exemption from PERB’s impasse procedures, has no effect upon the City’s right, pursuant to Civil Service Law § 212 (1) and (2), to opt out of the PERB impasse procedures since chapter 13 did not amend Civil Service Law § 212 (1) and (2) so as to preclude the City from exercising such opt out rights.
In 1929, the Court of Appeals decided the seminal Home Rule case by upholding the constitutionality of the Multiple Dwelling Law which had been enacted without a Home Rule message (Adler v Deegan, 251 NY 467 [1929]). In reaching this conclusion, Chief Judge Cardozo, in his often quoted concurring opinion, established three areas: (1) exclusive State concerns such as the laws of "domestic relations, of wills, of inheritance, of contracts, of crimes not essentially local (for *576 example, larceny or forgery), the organization of courts, the procedure therein”; (2) purely local concerns such as "the laying out of parks, the building of recreation piers, the institution of public concerts”; and (3) the area "where State and city concerns overlap and intermingle” (Adler v Deegan, supra, 251 NY, at 489). If the area sought to be legislated is purely a State concern, then the ordinary course of legislation may be followed (Adler v Deegan, supra, 251 NY, at 489). On the other hand, if the area sought to be legislated is purely a local concern, then the State cannot legislate on such matters without a Home Rule message (Adler v Deegan, supra, 251 NY, at 484-485). Where the area sought to be legislated implicates concerns that overlap and intermingle between the State and the locality, but involves a substantial State concern, the State may freely legislate notwithstanding the fact that the concern of the State may also touch upon local matters (Adler v Deegan, supra, 251 NY, at 489-490).
In discussing the area pertaining to purely local concerns, Chief Judge Cardozo wrote: "I come back, then, to this, that the fundamental question to be determined is the line of division between city and State concerns. In every case, 'it is necessary to inquire whether a proposed subject of legislation is a matter of State concern or of local concern’ * * * If the former, the ordinary course of legislation may be followed. There are some affairs intimately connected with the exercise by the city of its corporate functions, which are city affairs only. Illustrations of these I have given, the laying out of parks, the building of recreation piers, the institution of public concerts. Many more could be enumerated.” (Adler v Deegan, supra, 251 NY, at 489 [citation omitted].) While the administration and control of municipal agencies, the true subject of chapter 13, is not specifically enumerated in Adler as an example of purely local concern, the opinion makes clear that absence from the list is not significant since "[m]any more could be enumerated.” (Supra.)
In deciding whether chapter 13 involves an area of truly local concern, it is significant that the Court of Appeals has held that "[hjistorically and as a matter of common knowledge” fire departments have been viewed as municipal agencies, and their organization, operation and administrative control have been deemed matters of local concern, requiring a Home Rule message (Matter of Osborn v Cohen, 272 NY 55, 60 [1936]).
Seven years after the decision in Adler (supra) the Osborn Court wrote: "In allocating a particular statute to the one cat *577 egory or the other, no doubt 'the degree of interest on the part of sections of the state, outside of the city or cities directly affected by a statute, may be a relevant factor.’ * * * But it is not the essential or fundamental factor. Historically and traditionally the State has functioned in certain fields of government, the municipalities in certain other fields. While always and unavoidably there has been an obscure zone between the two fields, the basic distinction between them remains. 'Let us,’ said Crane, J., in Adler v. Deegan (p. 478), 'recognize in our decision the useful division which custom and practice have made between those things which are considered State affairs, and those which are purely the affairs of cities.’ So, in that case, the subject of the statute, which at first blush seemed to relate only to the affairs of cities, was held to be of State concern, since it dealt with the maintenance of life and health. 'The advancement of that interest, like the advancement of education, is a function of the State at large.’ * * * The holding in Robertson v. Zimmermann (268 N. Y. 52) rested upon the same foundation. Transportation * * * and widespread unemployment * * * like health and education, have been, by custom, tradition and practice, considered as matters of State concern * * * Not so, however, the establishment and control of fire departments. Historically and as matter of common knowledge, fire departments have been recognized agencies of municipal governments, and their organization, operation and administrative control have been deemed matters of local concern.” (Matter of Osborn v Cohen, supra, 272 NY, at 59-60 [emphasis added] [citations omitted].) Similarly, in Holland v Bankson (290 NY 267 [1943]) the Court found tours of duty and hours of duty for firefighters is a local concern and cited Osborn for support. Although the Court in Uniformed Firefighters Assn. v City of New York (50 NY2d 85, supra) held that the residential mobility of civil service members such as firefighters, which is unrelated to job performance or departmental organization, is a State concern, the Court nonetheless deemed still valid the principle enunciated in Matter of Osborn v Cohen (supra), that the organization, operation and administration of fire departments are matters of local concern. The Court specifically reiterated that "the structure and control of municipal service departments”, job performance, departmental organization, the duties and the number of firemen, the hours of work are matters of local concern (Uniformed Firefighters Assn. v City of New York, supra, 50 NY2d, at 90). No logical rationale is presented to indicate that the Police Department is *578 not a municipal agency or is to be treated differently than the Fire Department. Indeed, the PBA’s argument that the statute encompasses both the Police and Fire Departments is powerful evidence to the contrary.
Although on its face Section 1 does not purport to interfere with the City’s control and organization of its Police Department, in substance Section 1 has precisely that effect (see, e.g., Matter of Mayor, Aldermen & Commonalty of City of N. Y. [Elm St.], 246 NY 72, 76 [1927] [must proceed beyond terms of statute and inquire the effect of the statute to determine whether the statute is general or local]). An examination of the still effective collective bargaining agreement between the City and its police officers reveals that in addition to "salaries” areas such as "leaves”, "vacations”, "seniority”, "hours and overtime”, "tours of duty”, "optional work during vacation”, and "overtime travel guarantee” are subjects covered in the collective bargaining agreement. It would be difficult to find matters of more local concern than these. Should the State, through PERB, be permitted to invoke its impasse procedures contemplated under Section 1 these purely local matters would be subject to binding arbitration. The net effect would be to permit the State to determine by way of binding arbitration not only wages, but also the day-to-day organization, operation and administration of the municipality’s police department, and the job performance of its employees.
However, assuming arguendo that the subject matter affected by chapter 13 does not fall into the area of a purely local concern, but rather into the overlapping third category, Section 1 would still require a Home Rule message. The test for this area is not one of predominance, but, whether "the subject be in substantial degree a matter of State concern” (Adler v Deegan, supra, 251 NY, at 491; see also, Matter of Town of Islip v Cuomo, 64 NY2d 50, 56 [1984]; Matter of Kelley v McGee, 57 NY2d 522, 538 [1982]; Robertson v Zimmermann, 268 NY 52, 60-61 [1935], supra).
In an attempt to fit chapter 13 into this third category, defendants contend that the legislation deals with such areas of substantial State concern as encouraging the peaceful resolution of labor disputes with public employees and reducing the disparity of pay between City and suburban police so as to prevent the City’s loss of qualified police officers.
As to the first concern, although no one can argue the peaceful resolution of labor disputes is a laudable objective, it is fatuous to suggest that Section 1 will accomplish this. Section 1 *579 does not deal with peaceful labor negotiations, it deals solely with who shall declare and manage collective bargaining impasses. Labeling Section 1 as a mechanism for the peaceful resolution of labor disputes is a transparent attempt to recast chapter 13 to fit a recognized category of substantial State interest — the kind of tortured reasoning rejected by Chief Judge Cardozo in Adler (supra). Moreover, the legislative debate makes it abundantly clear that the stated concern of the Legislature was uniformity, a goal not achieved by Section 1, which permits other localities to opt out of PERB’s jurisdiction. Accepting this argument would justify the State’s passage of almost any statute without a Home Rule message, a result which would effectively eviscerate Home Rule.
The real purpose of this legislation is to reduce the disparity in pay between New York City police officers and their suburban counterparts. It is a sad but true fact of life that the N.Y.P.D. — the finest Police Department in the world — is paid substantially less than the police officers of other State subdivisions. Were it not for the City’s precarious financial condition, that disparity would undoubtedly be swiftly addressed in this round of collective bargaining. It is the PBA’s belief that PERB will redress this imbalance which drove this legislation through both Houses of the Legislature and an ultimate override of Governor Pataki’s veto.
The core question then is whether this is a matter of substantial State concern when the funds required to redress this imbalance will come solely from the City’s purse. As pointed out by Chief Judge Cardozo, the "[m]ost important of all [factors] perhaps is the control of the locality over payments from the local purse” (Adler v Deegan, supra, 251 NY, at 489). Defendants rely principally on the case of Matter of Kelley v McGee (57 NY2d 522, supra) as an example of the substantial State interest in the compensation or appointment of local law enforcement officers. However, the statute in Kelley, which dealt with the compensation of District Attorneys, was of Statewide application and affected every county in the State having a population of more than 40,000 inhabitants. This statute is directed solely to New York City and permits other localities to opt out of PERB’s jurisdiction. Further, there is a significant difference in impact on the local purse between the pay of fewer than 62 District Attorneys and the pay of approximately 35,000 local police officers of New York City. If, as defendants contend, the Legislature can amend the Taylor Law by narrowing the City’s mini-PERB’s jurisdiction to exclude impasses *580 involving its police, while allowing other localities to retain such jurisdiction and by so doing vastly increase the City’s labor cost without making any contribution thereto, nothing would remain of Home Rule.
Accordingly, the City’s motion for summary judgment is granted, and PBA’s motion to dismiss is denied. The court declares that chapter 13 is unconstitutional on the ground that it violates the Home Rule provision of the State’s Constitution. The court further declares that the BCB continues to have jurisdiction over collective bargaining impasses between the City and its police officers.