County of Onondaga v State of New York (2025 NY Slip Op 05737)

County of Onondaga v State of New York

2025 NY Slip Op 05737

Decided on October 16, 2025

Court of Appeals

Garcia, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on October 16, 2025

No. 66 

[*1]County of Onondaga, et al., Appellants,
v
State of New York, et al., Respondents, et al., Defendant. (And Other Actions.)

Janet D. Callahan, for appellants County of Onondaga, et al.
Angelo J. Genova, for appellants County of Nassau, et al.
Robert F. Julian, for appellants County of Oneida, et al.
Misha Tseytlin, for appellants Jason Ashlaw, et al.
Sarah L. Rosenbluth, for respondents State of New York, et al.
W. Bradley Hunt, for respondent Dustin M. Czarny.
New York Association of Towns, Town of Riverhead, et al., Washington County Board of Supervisors, New York Association of Counties, Madison County, et al., County of Warren, et al., amici curiae.

GARCIA, J.

In 2023, the Legislature enacted the Even Year Election Law (L 2023, ch 741) to consolidate certain elections for county and town offices with even year elections for state and federal offices. Plaintiffs, including several counties with charter provisions setting local elections for odd-numbered years, challenge the constitutionality of the Even Year Election Law, claiming the statute violates the home rule provisions of article IX of the State Constitution. We hold that there is no express or implied constitutional limitation on the legislature's authority to enact the Even Year Election Law and therefore affirm.
I.
To achieve its goal of consolidating local elections with state and national races, the Even Year Election Law (EYEL), effects changes to the County Law, Town Law, and Village Law to move certain local elections to even years. The EYEL also amends Municipal Home Rule Law § 34 (3), adding to the list of subjects as to which "a county charter or charter law shall not supersede any general or special law enacted by the legislature" any provision "[i]nsofar as it relates to requirements for counties . . . to hold elections in even-numbered years for any position of a [*2]county elected official" other than exempted positions [FN1]. The legislation also provides that, while the 2025 elections are still scheduled to occur as planned, officials subject to reelection in an odd-numbered year "shall have their term expire as if such official were elected at the previous general election held in an even-numbered year" (L 2023, ch 741, § 5). So, for example, someone elected in 2025 to what would have previously been a four-year term will see that term expire at the end of three years. The sponsor's memorandum explained that it was designed to "make the [voting] process less confusing for voters and . . . lead to greater citizen participation in local elections" in light of studies showing that "voter turnout is the highest on the November election day in even-numbered years when elections for state and/or federal offices are held" (Assembly Mem in Support, Bill Jacket, L 2023, ch 741 at 11).
Several counties and towns within those counties, all holding local elections during odd numbered years, filed the instant action against the State of New York, the governor, and the Commissioner of the Onondaga County Board of Elections (defendants), alleging that the EYEL violates article IX of the State Constitution. Some counties and towns within those counties raised additional constitutional claims, and a group of individual voters raised other state constitutional challenges. Each complaint sought a declaration that the EYEL is unconstitutional and that the provisions of the county charters that conflict with the EYEL are valid, as well as an injunction against enforcement of the EYEL. The complaints were consolidated in Supreme Court and defendants moved to dismiss.
Supreme Court denied the motions, declared the EYEL unconstitutional, and enjoined the defendants from enforcing the statute (86 Misc 3d 214 [Sup Ct, Onondaga County 2024]). That court held that under article IX of the State Constitution, "[c]ounties have the constitutional right to set their own terms of office," that the EYEL is not a general law by which the State may "invade matters of local concern," that the EYEL is not a valid special law because the procedural prerequisites were not followed nor is a substantial state concern involved, and as a result "the State's attempt to alter counties' timing of elections and terms of office for county offices is unconstitutional" (id. at 226).
The Appellate Division reversed and granted the motions, declaring that the EYEL "does not violate the New York Constitution or the United States Constitution" (238 AD3d 1535, 1536 [4th Dept 2025]; see also 43 NY3d 935 [2025] [transferring these direct appeals to the Appellate Division]). Considering the high burden placed on a party challenging the constitutionality of a duly enacted statute and acknowledging that the EYEL "purports to encourage an increased voter turnout in local elections now scheduled in odd-numbered years . . . consistent with the State's public policy of encouraging participation in the elective franchise by all eligible voters to the maximum extent," that Court held that "the EYEL does not violate article IX of the New York Constitution" (id. at 1537-1538). The remaining constitutional claims, including those brought by the individual voters, were also rejected. Plaintiffs appeal as of right (see CPLR 5601 [b] [1]). We agree with the Appellate Division's well-reasoned decision and we now affirm.
II.
While the State Constitution establishes the state government as "the preeminent sovereign of New York" (Matter of Baldwin Union Free Sch. Dist. v County of Nassau, 22 NY3d 606, 619 [2014]), it also reflects a "deeply felt belief that local problems should, so long as they do not impinge on affairs of the people of the State as a whole, be solved locally" (Matter of Resnick v County of Ulster, 44 NY2d 279, 288 [1978]). The "home rule" provisions in the State Constitution balance these two principles in allocating power between the State Legislature and local governments, "encourag[ing] local responsibility to deal with matters properly characterized as 'local,' " while at the same time "reserv[ing] to the state the power to deal with matters of broader concern" (New York State Temporary State Commission on the Constitutional Convention, Local Government 66 [1967]).
Authority granted to local governments derives from the State's otherwise plenary power, and "[g]iven that the authority of political subdivisions flows from the state government and is, in a sense, an exception to the state government's otherwise plenary power, the lawmaking power of a county or other political subdivision can be exercised only to the extent it has been delegated by the State" (Baldwin, 22 NY3d at 619 [internal quotation marks and citations omitted]). Indeed, "municipalities are entirely under the control of the state legislature except insofar as [*3]it may be restricted by state constitutional limitations" (J.D. Hyman, Home Rule in New York 1941-1965: Retrospect and Prospect, 15 Buffalo L Rev 335, 336 [1965]). Accordingly, the State Constitution provides for home rule by granting local governments certain powers and by restricting the legislature's ability to interfere with that local authority (see Richard Briffault, Local Government and the New York State Constitution, 1 Hofstra L. & Pol'y Symp. 79, 85-86 [1996]). In sum, although "[t]he power granted to counties over the nature and functions of its local offices is a significant one" (Matter of Kelley v McGee, 57 NY2d 522, 536 [1982]), the legislature remains the "preeminent sovereign" (Baldwin, 22 NY3d at 619) with "untrammeled primacy . . . to act . . . with respect to matters of State concern" (Wambat Realty Corp. v State of New York, 41 NY2d 490, 497 [1977]).
Achieving balance between State interests and local authority has proved challenging, and "the path of home rule . . . has been unsettled and tortuous" (see Kamhi v Town of Yorktown, 74 NY2d 423, 428 [1989]). The idea of some local autonomy is found in our first Constitution, enacted in 1777, which provided for local election of certain local officers (1777 NY Const, art XXIX). The 1846 constitution provided for election by voters in the relevant locality of all county, "city, town, and village officers" whose election or appointment was not prescribed elsewhere (1846 NY Const, art X, § 2). But it was the 1894 constitution that marked "the first time a measure of home rule was explicitly granted constitutional status" (Peter Galie, Ordered Liberty 176 [1996]), with a provision that "prohibited the legislature from transferring out of local hands the local functions performed by locally elected officials" (Briffault, 1 Hofstra L. & Pol'y Symp. at 84). An amendment in 1923 "provided the first constitutional grant of local law-making authority" (id. at 86), while a 1935 amendment "required the legislature to provide alternative forms of government for counties, and prescribed the method for the adoption of their charters" (Hyman, 15 Buffalo L Rev at 347). A 1938 amendment incorporated the home rule provisions of these amendments into article IX and added the authority "to adopt and amend local laws not inconsistent with the constitution and laws of the state relating to its property, affairs or government" (NY Const, art IX, § 12, amended November 8, 1938). This version of the home rule provision "contained both an affirmative grant of power 'to adopt and amend local law not inconsistent with the constitution and laws of the state relating to the property, affairs or government,' and restrictions on state legislative interference in matters where municipalities had affirmative power" (Galie at 286). A 1958 amendment to article IX granted to all counties the right to adopt alternative forms of government (NY Const, art IX, § 12, amended November 4, 1958).
The current version of article IX, adopted in 1963, "maintained continuity with the home rule tradition of New York" and was "the cumulation of lengthy constitutional debate and experimentation" over time (Galie at 288). Its "manifest intent was to encourage local governments to make a living document of the bill of rights for local government" (Resnick, 44 NY2d at 286). While article IX is "the most significant delegation of state legislative authority" (Baldwin, 22 NY3d at 620) and "the 1963 home rule amendment was intended to expand and secure the powers enjoyed by local governments," it is the product of "a fine-tuned sensitivity to the difficult problem of furthering strong local government but leaving the State just as strong to meet the problems that transcend local boundaries, interests, and motivations" (Wambat, 41 NY2d at 498).
Article IX begins with a "bill of rights for local governments" announcing that "[e]ffective local self-government and intergovernmental cooperation are purposes of the people of the state" and referring to the provision of "rights, power, privileges and immunities" that local governments "shall have" (NY Const, art IX, § 1). Those rights include the right to have a "legislative body elective by the people thereof" with the "power to adopt local laws as provided by this article" and a mandate that "[a]ll officers of every local government whose election or appointment is not provided for by this constitution shall be elected by the people of the local government" or appointed (id. §§ 1 [a], [b]). The right of counties to "adopt, amend or repeal alternative forms" of government, "empowered by" statute, found in the 1958 amendment, is carried forward in section 1 (h) (1).
Section 2 gives the legislature power, "[s]ubject to the bill of rights of local governments and other applicable provisions of this constitution," to "act in relation to the property, affairs or government of any local government only by general law, or by special law" meeting certain procedural requirements (NY Const, art IX, § 2 [b] [2]). That is, subject to the rights provided in section 1, the State can use the "ordinary legislative process" to limit local action (Galie at 290). Section 3 reserves certain topics entirely to the state, outlines a savings clause providing that nothing in article IX "affect[s] any existing valid provisions of acts of the legislature or of local legislation and such provisions shall continue in force until repealed, amended, modified or superseded in accordance with the provisions of this constitution," and provides for a liberal construction of the "[r]ights, powers, privileges and immunities granted to local governments" (NY Const, art IX, § 3). Article IX balances power granted to local governments over [*4]local matters with State power to displace those local decisions in certain circumstances (see Briffault, 1 Hofstra L. & Pol'y Symp. at 89).
The Municipal Home Rule Law was enacted contingent on the passage of the current form of article IX to "provide for carrying into effect provisions of article nine of the constitution . . . and to enable local governments to adopt and amend local laws for the purpose of fully and completely exercising the powers granted to them under the terms and spirit of such article" (see Municipal Home Rule Law §§ 50, 59). As relevant here, Municipal Home Rule Law § 33 (3) (b) requires that county charters must "provide for . . . the manner of election or appointment" and "terms of office" for "agencies or officers responsible for the performance of the functions, powers and duties of the county," while Municipal Home Rule Law § 34 (3) contains a list of topics that a county charter cannot address in a manner inconsistent with enacted state legislation.
III.
The issue for this Court is whether article IX limits the power of the legislature in such a way as to make the EYEL an unconstitutional exercise of legislative authority. We conclude that it does not.
Plaintiffs first challenge the constitutionality of the statute under section 1, arguing that, because of the rights detailed in section 1 as implemented by the Municipal Home Rule Law, counties have a constitutional right to set the timing of county elections and terms of office. In other words, because counties are authorized to adopt alternative forms of government (NY Const, art IX, § 1 [h] [1], and because those counties that do so are instructed by the Municipal Home Rule Law to provide for "the manner of election" and "terms of office" of its officials in those charters (Municipal Home Rule Law § 33 [3] [b]), that statutory instruction from the Municipal Home Rule Law is transformed into a constitutional right barring the legislature from interfering with the manner of election or terms of office for local officials. Nothing in the text of these provisions, or in our jurisprudence, supports that view. Indeed, only the right to form an alternative form of government is guaranteed by section 1 (h) (1), that right does not implicitly include a right to set terms of office or timing of elections, and the authority delegated to local governments in the Municipal Home Rule Law is statutory. Nothing in the EYEL infringes the rights provided by article IX's "bill of rights."
Next, plaintiffs argue that the EYEL is unconstitutional under article IX, section 2 (b) (2) because the legislature is only empowered to act in this manner pursuant to general law or a duly enacted special law and, in their view, the EYEL is neither. This is incorrect. As defined by article IX, § 3 (d) (1), a general law is one "which in terms and in effect applies alike to all counties, all counties other than those wholly included within a city, all cities, all towns or all villages." This Court has long held that a statute remains a general law where it is "cast in general terms" but affects a smaller category of counties, and is "no less general because it classifies the [counties] affected on the basis of population or some other condition and extends its benefits only to" certain counties, so long as "the classification be defined by conditions common to the class and related to the subject of the statute" (Uniformed Firefighters Assn. v City of New York, 50 NY2d 85, 90 [1980]; see also Rozler v Franger, 61 AD2d 46, 51 [4th Dept 1978], affd 46 NY2d 760 [1978] [that Village Law exempts chartered villages does not "make it any less a general law," because the "exception . . . is based on a reasonable classification and the law applies uniformly to all other villages throughout the state"]). The EYEL, as the Appellate Division held, is a general law because it applies to all counties, with reasonable exceptions, and has an equal impact on a "rationally defined class similarly situated" (238 AD3d at 1540-1541 [internal quotation marks and citation omitted]; see also Hotel Dorset Co. v Trust for Cultural Resources of City of N.Y., 46 NY2d 358, 373 [1978] [where a law "has an equal impact on all members of a rationally defined class similarly situated, the law is thus a general" law]). While the EYEL contains exemptions, its terms are general, and the category of counties and offices it affects is defined by common conditions and related to the statute's purpose.
Finally, plaintiffs challenge the EYEL on the basis that it runs afoul of the clause in article IX, § 3 (b), which provides that the provisions of article IX "shall not affect any existing valid provisions of acts of the legislature or of local legislation." This language simply made clear, as the Appellate Division held, that existing local laws remained in force following the adoption of article IX, and expressly accounts for change through legislative action by stating that existing local provisions continue "in force until repealed, amended, modified or superseded" (see 238 AD3d at 1541 [article IX, § 3 "clarifies that the adoption of Article IX did not itself invalidate then-existing legislation . . . and does not preclude the Legislature from adopting a law such as the EYEL"]).
Nothing in article IX limits, expressly or by implication, the otherwise plenary authority of the legislature to mandate the timing of certain elections, as the EYEL does (see Matter of Burr v Voorhis, 229 NY 382, 388 [1920] [*5]["(T)he legislature is free to adopt concerning (voting) any reasonable, uniform and just regulations which are in harmony with constitutional provisions"]). Consequently, without any such constitutional limitation, the EYEL is a proper exercise of that authority.
IV.
The individual voter plaintiffs' claims [FN2] were also properly dismissed. Even assuming without deciding that the test under Anderson v Celebrezze (460 US 780, 783 [1983]) and Burdick v Takushi (504 US 428, 433-434 [1992]) applies to these claims brought under the State Constitution, and accepting plaintiffs' allegations in their complaint as true, the EYEL passes that test. Consideration of "the character and magnitude of the asserted injury" to the protected rights as compared to "the precise interests put forward by the State as justifications for the burden imposed by its rule," in light of "the extent to which those interests make it necessary to burden plaintiff's rights," requires dismissal of plaintiffs' complaint (Matter of Walsh v Katz, 17 NY3d 336, 344 [2011] [internal quotation marks and citations omitted] [applying Anderson/Burdick test to federal constitutional challenge to a statutory residency requirement]). Any alleged injury is minor as compared to the State's legitimate and substantial interest in increasing voter turnout and reducing confusion. The EYEL is a neutral law which changes the timing of elections in a manner common to all voters, and imposes no form of restriction, burden, or limitation on voting. As a result, dismissal of these claims on the pleadings was appropriate.
Plaintiffs' remaining claims are meritless and we agree with the Appellate Division that there is no reason to delay application of the statute to the next election cycle (see 238 AD3d at 1542-1543).
Accordingly, the order of the Appellate Division should be affirmed, without costs.
Order affirmed, without costs. Opinion by Judge Garcia. Chief Judge Wilson and Judges Rivera, Singas, Cannataro, Troutman and Halligan concur.

Decided October 16, 2025

Footnotes

Footnote 1: The EYEL exempts offices whose terms are specified in the Constitution, offices for which elections must occur in odd numbered years pursuant to the Constitution, offices with a three-year term before January 1, 2025, offices in towns coterminous with villages, and offices in counties located in New York City (L 2023, ch 741, §§ 1-4; see also NY Const, art XIII, §§ 8, 10, 12, 13, 17).

Footnote 2: Individual voter plaintiffs' complaint alleges that the EYEL's consolidation of local elections with even-year elections "increases the burdens associated with casting a vote, fundraising, and generating support for candidates, among other essential campaigning activities, while contributing to voter fatigue due to higher numbers of issues and/or candidates on the ballot" and that "[w]ith more candidates on the ballot and higher turnout numbers, voters will face longer ballots, longer voting lines, voter fatigue, and 'ballot drop-off' or 'roll-off.' " These are not traditional voter suppression claims.